**THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
COLUMBUS DIVISION**

LEAGUE OF WOMEN VOTERS OF OHIO;
COUNCIL ON AMERICAN-ISLAMIC
RELATIONS-NORTHERN OHIO,

              Plaintiffs,

    v.

FRANK LAROSE, in his official capacity as the
Ohio Secretary of State,

              Defendant.

**Case No.: 2:26-cv-177**

**COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF**

**PRELIMINARY STATEMENT**

1.      Twenty years ago, a federal court in Ohio struck down an Ohio statute that imposed "an undue burden on the fundamental right to vote of naturalized citizens in Ohio," calling it a "shameful . . . example of how the State of Ohio says 'thank you' to those who helped build this country."[1] In enacting Ohio Senate Bill 293 ("SB 293"), the Ohio Legislature has doubled down on its discriminatory treatment of naturalized citizens and other Ohio citizens who will inevitably be swept up in this law's grips, including members of the Plaintiff organizations. This new law is not only shameful; it also violates the National Voter Registration Act ("NVRA") and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

2.      SB 293 directs the Secretary of State to check Ohio voter registration records against Ohio's Bureau of Motor Vehicles ("BMV") database and the federal Systematic Alien Verification for Entitlements ("SAVE") system at least monthly to detect registered voters either flagged as noncitizens or with mismatching data. Individuals flagged under these citizenship-

---

[1] *Boustani v. Blackwell*, 460 F. Supp. 2d 822, 827 (N.D. Ohio 2006).

check requirements will have their voter registrations cancelled without prior notice and an accompanying opportunity to respond, even on the eve of an election.

3.     Yet both the BMV database and SAVE system rely on stale citizenship data, which frequently misclassify naturalized citizens as ineligible to vote. For example, many Ohioans need not update their driver's licenses or state ID cards for eight years after issuance (and others for four years), meaning BMV data will reflect outdated citizenship status for many of the tens of thousands of Ohioans who naturalize each year. The SAVE system suffers from similar data problems and additional ones to boot. By relying on these databases with unreliable citizenship data to purge voters without prior notice and an opportunity to be heard, including within 90 days of federal elections, SB 293 violates federal law and the U.S. Constitution in several ways, irreparably harming Plaintiffs' members in the process.

4.     First, SB 293 violates Section 8(c) of the NVRA because it mandates a systematic voter removal program for reasons other than death, criminal conviction, or by request of the registrant within 90 days of a federal election. 52 U.S.C. § 20507(c)(2).

5.     Second, SB 293 violates Section 8(b) of the NVRA because it uses databases that will result in greatly disproportionate rates of eligible naturalized citizens being purged from the voter rolls (and does so knowingly), rendering the State's voter list maintenance program neither uniform nor nondiscriminatory. 52 U.S.C. § 20507(b)(1).

6.     Third, SB 293 violates the Fourteenth Amendment's Due Process Clause because it authorizes the State to deprive eligible voters of their liberty interest in their vote without providing adequate notice and an opportunity to be heard or to cure alleged deficiencies.

7.     The Court should enjoin the Secretary from enforcing these deeply flawed and unlawful provisions.

## JURISDICTION AND VENUE

8.     This action is brought pursuant to 52 U.S.C. § 20510(b), which provides that "[a] person who is aggrieved by a violation of [the NVRA] may bring a civil action in an

appropriate district court for declaratory or injunctive relief with respect to the violation," as well as 42 U.S.C. § 1983.

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331. It is authorized to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

10.     This Court has personal jurisdiction over Defendant LaRose in his official capacity because he is a citizen and elected officer of the State of Ohio and his principal place of business is in Ohio.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendant LaRose resides in this judicial district and a substantial part of the events and omissions alleged occurred and will occur in this district.

## PARTIES

12.     Plaintiff League of Women Voters of Ohio ("LWVO" or "the League") is the Ohio state affiliate of the League of Women Voters, a nonpartisan, nonprofit, grassroots organization founded in 1920 as an outgrowth of the struggle for women's right to vote now working to protect and expand voting rights and ensure everyone is represented in our democracy. LWVO is headquartered in Columbus, Ohio, and is a nonprofit, nonpartisan membership organization that encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy. As of the time of filing this Complaint, the League has 37 local Leagues and at-large units throughout Ohio and 3,930 dues-paying members. The vast majority of the League's members are registered Ohio voters.

13.     The League's membership includes naturalized citizens who are especially vulnerable to being improperly flagged and removed under SB 293's systemic purges because they were previously recorded as noncitizens in the BMV database and/or the SAVE system. For example, League member and Ohio registered voter Jona Hilario is a naturalized U.S. citizen

who was improperly flagged in a 2024 election audit conducted by Secretary LaRose that purported to identify and remove non-U.S. citizens from Ohio's official list of eligible voters.

14.     SB 293 will hamper the League's core voter-registration and voter-support efforts and force it to divert additional resources to mitigate the law's effects and educate voters about them.

15.     The League dedicates a significant proportion of its resources to voter-engagement work, including voter registration. In addition to its general registration efforts, the League also conducts voter registration at naturalization ceremonies and at festivals celebrating various cultures and nationalities.

16.     Because SB 293 mandates regular and systematic purges, the League will be forced to divert resources from its core voter-engagement activities to educate voters, especially naturalized citizen voters, on how to avoid erroneous removal from Ohio's official list of eligible voters, and, if removed, on how to attempt to re-register in time to vote.

17.     During the approach of every federal election, the League is already working at the height of its capacity. SB 293 will make this resource strain even more acute because its systematic audits and purges under SB 293 are required to continue up to and during the period when voter registration in Ohio is about to close or has closed, leaving no opportunity to correct erroneous removals.

18.     The strain on the League's capacity will be especially acute as it relates to assisting newly naturalized citizens, who are especially vulnerable to being improperly flagged and removed from Ohio's official list of voters. Moreover, the League will need to spend additional time preparing educational materials in languages other than English for some of these voters.

19.      As part of its mission, the League conducts statewide voter service meetings each month to plan the publication of voter guides, organize candidate events, and address other voter issues as they arise. Each local League has a voter service chair who participates in these meetings.

20.    Since the passage of SB 293, time must be spent at these meetings planning programming and education regarding the avoidance of the risk of wrongful removals by the new systematic citizenship checks and discussing how to try to correct those removals. This time, as well as the time spent on programming and education around SB 293, takes away from the League's other voter service priorities, which include programs to engage youth and active duty military voters (who have trouble accessing voting), addressing the pressing need for poll worker recruitment, fundraising, serving unhoused or housing-insecure voters, and election protection programs.

21.    The League, which cannot serve all voter-related needs, is forced to choose whom it is serving and how. The League's voter service efforts are necessarily limited by resources and volunteer time. Being required to devote time and resources to avoid, and try to correct, wrongful removals due to SB 293 diverts time and resources from the other critical voter service problems that the League needs to address, as well as from its voter registration and voter engagement efforts.

22.    With the passage of SB 293, the League will also have to engage in a complete audit of its voter education materials and review its local Leagues' materials. The League will have to expend resources to revise all of its informational materials and guidance to warn about the risks of these removals, including materials on its website, printed materials, social media, and VOTE411.org (the League of Women Voters Education Fund's nonpartisan online voter guide supported by state Leagues). The League will also have to educate and train volunteers on the risk of wrongful removals by operation of SB 293 and how to re-register if a person is removed in error. In addition, the League will have to translate its materials into at least seven languages.

23.    The Council on American-Islamic Relations of Northern Ohio ("CAIR-N.O.")— a non-profit, nonpartisan organization based in Cleveland, Ohio—is a chapter of the national Council on American-Islamic Relations ("CAIR"), the largest Muslim civil rights and advocacy organization in the country. CAIR-N.O. has an email listserv of 4181 individuals, a donor list of

2500 individuals, and a postal mailing list of 700 individuals and serves an area containing over 34 mosques. The Northern Ohio community, and particularly Muslims living there, finances CAIR-N.O.'s activities and serves as the pool from which its board is drawn. CAIR-N.O.'s board, which consists of 11 members, represents the Muslim community of Northern Ohio. The board's members reside in Cleveland, Akron/Kent, Youngstown, and Toledo, Ohio. According to CAIR-N.O.'s data, there are more than 20,000 Muslim voters in Cuyahoga County, 5,000 in Lucas County, nearly that many in in Summit County, about 2,000 in Mahoning County, and just under 1,000 in Wood County.

24. The mission of CAIR and its affiliates, including plaintiff CAIR-N.O., is to enhance the American public's understanding of Islam, protect civil rights, promote justice, and empower American Muslims. Its core principles include a commitment to protecting the civil rights of all Americans, regardless of faith, and opposing domestic policies that limit civil rights or prevent Muslims and others from participating fully in American civic life. This includes protecting the rights of eligible voters to register to vote and to vote in Ohio.

25. CAIR-N.O. dedicates a significant proportion of its resources to voter-engagement work, including the registration of naturalized citizens. Due to the regular and systematic purges prescribed by SB 293, CAIR-N.O. will be forced to divert resources it would otherwise spend on its core voter-engagement activities to educate voters, especially naturalized citizen voters, on how to avoid being removed from Ohio's official list of eligible voters and, if removed, to attempt to reregister in time to vote.

26. As a direct result of Secretary LaRose's carrying out the systematic audits and purges required by SB 293, CAIR-N.O. will be forced to spend considerable time and resources making voters and members aware of the potential risk of being removed from Ohio's official list of eligible voters, as well as instructing voters on how to attempt to re-register in time to vote, with resultant harm to its mission of registering newly naturalized citizens to vote.

27. CAIR-N.O. devotes a significant proportion of its resources throughout the year to direct services and civic engagement, particularly voter education and registration. Over the

past year-and-a-half, CAIR-N.O.'s Cleveland office worked with interns and volunteers to offer more than seventy civic engagement events, including voter registration opportunities. Every year, CAIR-N.O. holds an event for National Voter Registration Day and sends voter education materials as elections approach.

28.     CAIR-N.O. cannot serve all its constituents' needs. The services it provides are necessarily limited by resources and volunteer time, so CAIR-N.O. is forced to choose the services it can provide. Being required to devote time and resources to avoid and try to correct wrongful removals due to SB 293 diverts time and resources from the other critical problems and issues that CAIR-N.O. needs to address.

29.     Because CAIR-N.O. provides assistance to newly naturalized citizens, the strain on its capacity will be heightened by SB 293. Such citizens are especially vulnerable under SB 293. Moreover, CAIR-N.O. will need to provide educational materials to these citizens in languages other than English. Members of northern Ohio's Muslim communities speak at least seven different first languages.

30.     CAIR statewide leadership holds monthly meetings and participates in weekly meetings with their government affairs consultant to discuss harmful legislation. Since the passage of SB 293, time must be spent at these meetings planning programming and education to attempt to avoid the risk of wrongful removals by the new systematic audits and discussing how to try to correct these removals. This time takes away from CAIR-N.O.'s other priorities, which include advocacy and direct services, such as providing legal representation for those who have suffered civil rights violations in Northern Ohio.

31.     CAIR-N.O. serves numerous naturalized citizens who are especially vulnerable to being improperly flagged and removed by SB 293's systemic purges. Three of CAIR-N.O.'s current staff members are themselves naturalized citizens and Ohio registered voters, and CAIR-N.O. has five naturalized citizens who are Ohio registered voters on its Board.

32.     Defendant Frank LaRose is the Secretary of State of Ohio. He is the chief election officer of the State of Ohio and is responsible for overseeing voter registration and election administration throughout the State. *See* Ohio Rev. Code Ann. § 3501.04.

33.     In his official capacity, Secretary LaRose oversees the conduct of local elections, the operation of voting sites, and the State's obligations under the NVRA, including maintaining voter registration lists. *Id*. § 3501.05(Q). As part of these responsibilities, Secretary LaRose is responsible for adopting rules for removing ineligible voters and for ensuring that eligible voters can register to vote and remain registered. *Id.* He is also responsible for ensuring that the State and its local boards of elections comply with Section 8 of the NVRA. *See* 52 U.S.C. § 20509; *see also* Ohio Rev. Code Ann. § 3501.05. Under SB 293, Secretary LaRose is also tasked with providing county election officials lists of purportedly ineligible noncitizens, who must then be purged from the rolls without prior notice. *See* SB 293 (attached as Ex. 1) § 3503.152(B)(1).

34.     Secretary LaRose's office is located at 180 Civic Center Dr., Columbus, Ohio 43215. Secretary LaRose is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.     Ohio's Registered Voters, the BMV database, and the SAVE system.

35.     Ohio currently has just over 7.9 million registered voters, including tens of thousands who have already registered since the start of this calendar year.

36.     As of 2022, approximately 4% of those registered voters—roughly 300,000 Ohioans—were naturalized citizens.

37.     In fiscal year 2022 alone, over 16,000 Ohioans naturalized as U.S. citizens, and over 60,000 did so between 2016 and 2020.

38.     Ohio law allows both U.S. citizens and lawfully present noncitizens of Ohio to obtain Ohio driver licenses and state ID cards. Holders of a Permanent Resident Card, commonly known as a green card, can obtain a "regular Ohio driver license" upon producing proof of their

legal presence and Ohio residency, and the ID "will expire in four years or eight years depending on the applicant's choice and qualification."[2]

39.     Ohio's BMV maintains a database system that stores personal information about driver license and state ID card (non-driver ID) holders. This includes the following pieces of information: name; date of birth; social security number; card type; whether a person is a U.S. citizen; and whether a U.S. passport/passport card or naturalization document were presented for citizenship verification during the person's interaction with the BMV.

40.     In January 2023, Ohio enacted a law requiring newly issued Ohio driver licenses and state ID cards to denote the holder's citizenship status, designating them either as a U.S. citizen or as a non-U.S. citizen.

41.     Within just over two years after the since the law took effect, as of July 2025, the BMV reported that nearly 300,000 Ohioans had a driver license or state ID card indicating they are a non-citizen rather than a U.S. citizen. The BMV does not automatically update an individual's citizenship status when they naturalize; updates occur only if the individual self-reports a change or during their driver license or state ID card renewal.

42.     Although tens of thousands of Ohioans naturalize each year, Ohio law does not require newly naturalized citizens to update their driver license or state ID card to reflect their U.S. citizenship until the card expires, which occurs every four or eight years. Upon information and belief, many Ohioans—like League member Jona Hilario—do not undertake burdens of obtaining a new license or ID card before its expiration when the State does not obligate them to do so.

43.     Thus, many Ohioans who registered to vote as naturalized citizens are still recorded as noncitizens in the BMV database.

44.     The BMV system therefore suffers from significant lags in updating driver license- and state ID card-holder citizenship status because it relies on stale data, especially for

---

[2] *Driver License & ID Cards: Non-U.S. Citizens*, Ohio Bureau of Motor Vehicles, https://www.bmv.ohio.gov/dl-non-permanent-resident.aspx.

naturalized citizens. For example, green card holders who naturalize and become U.S. citizens within the four- or eight-year window after obtaining an Ohio driver license or state ID card may still be listed in the BMV system as noncitizen green card holders, even though they have become U.S. citizens and are eligible to vote.

45.    Ohio's prior use of BMV and SAVE data for voter-roll maintenance underscores the systems' accuracy concerns. In 2024, Secretary LaRose began using a combination of BMV and SAVE data to identify individuals for potential removal who had "twice confirmed their non-citizenship status to the BMV" but subsequently appeared on the voter registration rolls.[3]

46.    Because many of these voters had naturalized and registered to vote since they last confirmed non-citizen status to the BMV—like League member Jona Hilario—these purge efforts targeted numerous eligible, registered voters solely on the basis of their status as naturalized citizens.

47.    Unsurprisingly, some naturalized citizens who received the notice letters—which warned of further investigation and potential purges—were, in fact, eligible voters, and they reported feeling threatened and shocked by the letters' language, which "threaten[ed] jail time if [the registrant] had registered illegally."[4]

48.    One voter who immigrated as a young child and grew up in the United States before naturalizing as an adult and becoming a social studies teacher described how, had he not spoken English as his first language, grown up in the United States, *and* also been a social studies teacher with particular knowledge of our civics systems, he would have felt "scared" by the letter's mention of "potential felony charges" and its "presumpti[on] that he had made an error."[5]

---

[3] Press Release, *Secretary LaRose Announces Latest Action in Statewide Voter Registration Integrity Audit, Orders Removal of 499 Non-Citizen Registrations*, Frank LaRose: Ohio Sec'y of State (Aug. 1, 2024), https://www.ohiosos.gov/media-center/press-releases/2024/2024-08-01/.

[4] Nick Evans, *Ohio Sec. of State LaRose's Noncitizen Voter Registration Audit Sweeps In Naturalized Citizens*, Ohio Cap. J. (Aug. 6, 2024), https://ohiocapitaljournal.com/2024/08/06/ohio-sec-of-state-laroses-noncitizen-voter-registration-audit-sweeps-in-naturalized-citizens/.

[5] Nick Evans, *Naturalized Citizen Says Ohio Secretary of State Is Not Following Law in Voter Audits*,

49.     Plaintiffs are not aware of any major changes to BMV data or the frequency with which it updates its citizenship information since this 2024 effort that would prevent naturalized citizens from again being erroneously flagged as noncitizens.

50.     The SAVE system has similar built-in lags in naturalization information, as well as other accuracy problems.

51.     The SAVE system was created in the 1980s and has historically been used by federal, state, and local officials for citizenship inquiries related to public benefits, which were conducted on an individual basis using DHS immigration identification numbers, names, and birth dates.

52.     In recent years, some states have begun using SAVE to attempt to verify the citizenship of people on their voter rolls, but they have run into severe accuracy issues.

53.     For example, the North Carolina State Board of Elections determined in its Audit of the 2016 election that, "based on past experience," a "match with the SAVE database is not a reliable indicator that a person is not a U.S. citizen because the database is not always updated in a timely manner and individuals who derived citizenship from their parents through naturalization or adoption may show up as non-citizens in SAVE."[6]

54.     Last year, the federal government purportedly reconfigured SAVE to allow searches through social security numbers (instead of only DHS numbers) and for such searches to be able to be performed in bulk. These new attempts to use social security data and to link information from SAVE with that in other databases have presented new issues on top of the preexisting ones, particularly in using the data for voter list maintenance purposes.

55.     In October of 2025, for example, DHS itself disclosed that there was a risk that, through SAVE, "U.S. Citizenship and Immigration Services [("USCIS")] may share inaccurate

---

STATELINE (Aug. 20, 2024), https://stateline.org/2024/08/20/naturalized-citizen-says-ohio-secretary-of-state-is-not-following-law-in-voter-audits/.

[6] N.C. State Bd. of Elections, Post-Election Audit Report: General Election 2016 (Apr. 21, 2017), https://s3.amazonaws.com/dl.ncsbe.gov/sboe/Post-Election%20Audit%20Report_2016%20General%20Election/Post-Election_Audit_Report.pdf.

information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual … due to misspelling of names, transposed numbers, or incomplete information"—a risk that it could only partially mitigate.[7]

56.    In addition, any data that the Social Security Administration ("SSA") may now be sharing with SAVE likely only reflects a person's citizenship status when they applied for a social security number. Plaintiffs are not aware of any subsequent point at which SSA automatically updates a person's citizenship designation in their records that other than the individual themselves initiating contact with SSA to report that they have naturalized.[8]

57.    In Texas in late 2025, naturalized citizens were swept into an attempted purge of noncitizens using SAVE data. There, numerous known citizens were flagged erroneously, including "foreign-born children who acquired citizenship from parents who naturalized," a fact pattern that is common and yet is also "known to stump SAVE."[9] After finding that several voters flagged as noncitizens not only were citizens, but had also actually already provided that information to a state agency, Travis County Tax Assessor-Collector and Voter Registrar Celia Israel referred to the process of verifying these registrations as "'confirmation that SAVE is not a reliable resource.'"[10]

---

[7] U.S. Dep't of Homeland Sec., Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program 20 (Oct. 31, 2025), Page 19, https://www.dhs.gov/sites/default/files/2025-10/privacy-pia-dhsuscis006d-save-october2025%20%28002%29.pdf.

[8] Press Release, U.S. Citizenship & Immigr. Servs., USCIS Deploys Common Sense Tools to Verify Voters (May 22, 2025), https://www.uscis.gov/newsroom/news-releases/uscis-deploys-common-sense-tools-to-verify-voters; U.S. Soc. Sec. Admin., EN-05-10002, Your Social Security Number and Card 7 (2025), www.ssa.gov/pubs/EN-05-10002.pdf ("If your immigration status changed or you became a U.S. citizen, you should tell us so we can update your records. To have your immigration status or citizenship updated in our records, you need to show documents that prove your new immigration status or citizenship.").

[9] Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens.

[10] Natalia Contreras, *Some Registered Voters Texas Flagged as 'Potential Noncitizens' Had Already Shown DPS Proof of Citizenship*, VOTEBEAT & TEX. TRIBUNE (Dec. 18, 2025), https://www.texastribune.org/2025/12/18/texas-voter-roll-citizens-investigation/.

58.     Other election officials have expressed similar concerns after SAVE checks flagged, as noncitizens, voters known to be citizens. Seventy Missouri county clerks expressed this sentiment in a letter to Missouri state legislative leadership, saying that voters whom SAVE identified as noncitizens "regularly included 'individuals we know to be U.S. citizens – our neighbors, colleagues and even voters we have personally registered at naturalization ceremonies.'"[11] A South Carolina election official similarly expressed to federal officials that the information obtained from SAVE has "'raised more questions than it [has] answered.'"[12]

## II.     Ohio SB 293

59.     On December 19, 2025, Governor Mike DeWine signed Ohio Senate Bill 293 ("SB 293") into law. The effective date of the legislation is March 20, 2026.

60.     SB 293 makes major changes to the voter list maintenance program undertaken by Ohio's Secretary of State in coordination with Ohio's county boards of elections. Among its key changes, the law requires a database matching and removal program to be performed monthly using the BMV and SAVE databases' information on citizenship status.

61.     Prior to SB 293's enactment, there were *already* processes for checking the citizenship status of registered voters under Ohio and federal law: the NVRA's attestation requirement and Ohio's own statutory process.

62.     The NVRA requires state and federal voter registration forms to "include a statement that (A) specifies each eligibility requirement (including citizenship); (B) contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the applicant, under penalty of perjury." *See* 52 U.S.C. §§ 20508(b)(2); 20505(a)(1)–(2); *see also id.* § 20504(c) (requiring state motor vehicle departments to include a voter registration application form as part of its driver license application, with the same attestation and signature requirements

---

[11] Alexandra Berzon & Nick Coransaniti, *Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim*, N.Y. Times (Jan. 14, 2026), https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html.

[12] *Id.*

to verify citizenship). In other words, every registered Ohioan has attested to their status as a U.S. citizen upon registering to vote under penalty of perjury.

63. Ohio law also contains a citizenship verification process that SB 293 will nearly entirely replace once it goes into effect. This pre-existing process contained protections against improper removal and provided for reinstatement if cancellation was in error—all of which is removed under SB 293.

64. Under pre-existing law, the Secretary was required to review annually the statewide voter registration database to "identify persons who appear not to be United States citizens" by comparing the database with information received by the BMV showing that the individual provided documentation to the BMV that they were not a citizen both before *and after* registering to vote. *See* Ex. 1 at previously enacted § 3503.152(A).[13] Prior law required a process in which the Secretary sent the voter notices of possible cancellation and provided an opportunity for the individual to confirm their citizenship status prior to cancellation. *See id.* at previously enacted § 3503.152(B)-(E).

65. A May 14, 2024 Directive from the Secretary instructed county boards of elections to cancel the registrations of individuals who fail to respond to two notices of potential cancellation because of apparent non-citizenship and to send another notice following cancellation.[14] That Directive also noted that an individual whose registration was cancelled under this provision could "re-register at any time upon signing an attestation of United States citizenship under penalty of election falsification." *See* May 14, 2024 Directive, *supra* n. 14, at 1. The Secretary also provided guidance to the county boards of elections instructing them not to remove individuals identified by the review during the 90 days before a federal election. *See*

---

[13] Also available at https://search-prod.lis.state.oh.us/api/v2/general_assembly_136/legislation/sb293/05_EN/pdf/.

[14] *See* Directive from Frank LaRose, Ohio Sec'y of State, to All Cnty. Bds. of Elections, Bd. Members, Dirs., & Deputy Dirs., Directive 2024-08: Removal of Non-Citizens from Voter Registration Databases (May 14, 2024), https://www.ohiosos.gov/globalassets/elections/directives/2024/dir2024-08_annualreviewstatewidevoterregistrationdatabaseidentifynon-citizens.pdf (hereinafter "May 14, 2024 Directive").

August 1, 2024 Guidance ("The removal of registrations contained on the list provided by the Secretary of State must occur no later than **August 6, 2024**.") (emphasis in original)[15]; May 14, 2024 Directive at 3 (same).

66. In March 2025, the Ohio Secretary of State issued a third directive, which created a secondary, extra-statutory procedure to identify and remove alleged noncitizens from the voter registration database.[16] This directive provided that the Secretary of State would send confirmation notices to voters who were identified as a noncitizen in the BMV database and who the federal SAVE system also confirmed was a noncitizen. If the voter did not respond to the notice and confirm citizenship, the directive stated that the Secretary of State would include them on a list sent to the respective County Board of Elections, which had five business days to notify the voter of their impending removal.

67. Importantly, as noted above, the Secretary previously instructed county boards of elections not to remove individuals due to these systematic checks of citizenship data during the NVRA quiet period. This was not simply a preferred practice; prior Ohio law forbade the Secretary from conducting "the review described in this section during the ninety days immediately preceding a primary or general election for federal office." *See* Ex. 1 at previously enacted § 3503.152(F).

68. In addition to the pre-existing scheme for checking citizenship status, Ohio law already contains severe penalties for noncitizen voting that deter fraudulent registration and voting. Any individual who votes or attempts to vote in an Ohio or federal election in which they are "not a legally qualified elector" is guilty of a felony of the fourth degree, carrying up to 18

---

[15] *See* Directive from Frank LaRose, Ohio Sec'y of State, to All Cnty. Bds. of Elections, Bd. Members, Dirs., & Deputy Dirs., Directive 2024-16: Removal of Non-Citizen Records (Aug. 1, 2024), https://www.ohiosos.gov/globalassets/elections/directives/2024/dir2024-16_removalofnon-citizen-records.pdf (hereinafter "August 1, 2024 Directive").

[16] *See* Directive from Frank LaRose, Ohio Sec'y of State, to All Cnty. Bds. of Elections, Bd. Members, Dirs., & Deputy Dirs., Directive 2025-23: Continual Review and Removal of Noncitizen Records (Mar. 17, 2025), https://www.ohiosos.gov/globalassets/elections/directives/2025/directive-2025-23-continual-review-and-removal-of-noncitizen-records.pdf (hereinafter "March 17, 2025 Directive").

months of imprisonment (six months minimum) and a fine up to $5,000. *See* Ohio Rev. Code § 3599.12. Likewise, knowingly registering to vote when one is not a qualified voter is a fifth-degree felony under Ohio law, carrying a term of imprisonment of up to 12 months and a $2,500 fine. *See* Ohio Rev. Code § 3599.11.

69. As relevant here, SB 293 changed Ohio's system of purging voters from the rolls ("Purge Program") in three major categories: 1) instituting new citizenship database checks, 2) expanding the timing of citizenship database checks, and 3) mandating citizenship removals without notice.

70. *First*, SB 293 transforms the database matching process to identify purported noncitizen voters. The Secretary of State is directed to "consult[] the following sources" in reviewing the statewide voter registration database for potential noncitizens: (1) the BMV database, and (2) the SAVE database. *See* Ex. 1 § 3503.152(A)(1)–(2).

71. SB 293 removes prior protections that minimized erroneous removals of naturalized citizens. The Secretary of State is simply directed to "consult[]" the "[i]nformation the secretary of state obtains from the bureau of motor vehicles under section 3503.151 of the Revised Code," *see id.* at§ 3503.152(A), and from the SAVE database, then send a report to each board of elections identifying "each person in the county who, according to the databases . . .  is not a United States citizen." *Id.* at § 3503.152(B)(1).

72. The citizenship database matching process enables the Secretary to run a comprehensive, systematic data matching inquiry between the voter file and relevant database (either the BMV database or SAVE) and report all individuals flagged as potential noncitizens to the county boards of elections.

73. SB 293 then requires the county boards of elections to immediately cancel these individuals' registrations.

74. The statutory text of SB 293 does not include any measures to mitigate errors in the citizenship database which could result in recently naturalized citizens being improperly removed from the voter registration rolls.

16

75.     Given the structure of the BMV's database, SB 293 enables the Secretary to initiate the removal of any registered voter who submitted noncitizen documentation to the BMV in seeking a driver license or state ID card.

76.     In addition to the BMV database, SB 293 also directs the Secretary of State to "consult[]" the "systematic alien verification for entitlements (SAVE) program, or its successor program, operated by the United States department of homeland security or its successor agency" for purposes of identifying noncitizens. *See* Ex. 1 § 3503.152(A)(2).

77.     As discussed above, the SAVE database is likewise a faulty source of data for purposes of verifying citizenship status, and its errors disproportionately affect naturalized citizen voters who were previously issued an immigration identification number since U.S.-born citizens do not receive such numbers.

78.     Additionally, SB 293's text is unclear as to whether a voter may be placed on the purge list based on appearing as a noncitizen in *either* the BMV data or SAVE system, rather than requiring both, as was the case under the March 17, 2025 directive. *See also* 2026 Directive at 144–45.

79.     **Second,** SB 293's Purge Program also institutes major changes to the timing and frequency of citizenship database checks and their associated purges of registered voters. SB 293 instructs that the "secretary of state shall conduct reviews of the statewide voter registration database *on at least a monthly basis*." Ex. 1 § 3503.152(A) (emphasis added).

80.     SB 293 repeals the prior limitation on the Secretary from undertaking citizenship database reviews and systematic removals during the 90 days preceding a federal election. *Compare* Exhibit 1 at previously enacted § 3503.152(F) *with* SB 293 §§ 3503.152(A); 3503.152(B).

81.     In effect, SB 293's new Purge Program *requires* the Secretary to undertake systematic citizenship reviews and removals of registered voters at least once every month, including at least two times in the ninety days immediately preceding a federal election.

17

82.      *Third*, SB 293 directs that county boards of elections "promptly *shall* cancel" the registration of any individual identified by the Secretary of State through the aforementioned citizenship database checks without providing any prior notice to the registered voter. *See* Ex. 1 § 3503.152(B)(1) (emphasis added). This is underscored by the changes to the Ohio Election Manual, which requires county boards to remove "registrations found on the Secretary of State list within **five business days of receiving the list**."[17]

83.      The Secretary of State's Election Integrity Unit is also required to conduct a "further investigation regarding each such person" identified as a potential noncitizen whose voter registration is cancelled. Ex. 1 § 3503.152(B)(2).

84.      Only after the voter's registration is cancelled does the individual receive a notice from their county board of elections informing them of the cancellation, the reason for the cancellation, and the option to "contact the board of elections to correct the error." *See* Ohio Rev. Code § 3503.21(F)(1); *see also* Voter Registration Cancellation Notice-Noncitizen, Form No. 10-BB[18] ("You are hereby notified that your voter registration in the State of Ohio . . . has been canceled due to confirmation by the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) database that you are not a United States citizen.") The cancellation notice is sent to the mailing address associated with the voter's (now-cancelled) registration record. Thus, both the notice and any opportunity to respond occur only *after* the individual has been deprived of their interest in being registered to vote.

85.      While the updated Ohio Election Official Manual (EOM) states that the Secretary of State will provide notice prior to removal from the voter rolls, the Manual provides no detail on how or when that notice would be provided and contradicts the statutory text of SB 293, which requires the Secretary of State to send the report to counties following the review of

---

[17] *See* Ohio Election Official Manual, Chapter 4: Voter Registration, at 4-146, available at https://www.ohiosos.gov/globalassets/elections/directives/2026/eom/dir2026-06-ch04.pdf. (emphasis in original).

[18] Form available at https://www.ohiosos.gov/globalassets/elections/forms/10-bb.pdf

BMV and SAVE data. *Compare* Ohio Election Official Manual, Chapter 4: Voter Registration, at 4-145, *with* Ex. 1 § 3503.152(B). The Voter Registration Cancellation Notice-Noncitizen, Form No. 10-BB, *see supra* ¶ 84, on its face also appears to contemplate informing the voter only after removal from the rolls.

86.     An individual whose registration was cancelled and who seeks to correct an error would need to file an application for the correction of a precinct registration list with their county board of elections. *See* Ohio Rev. Code § 3503.24(A). Such applications must be made "not later than the thirtieth day before the day of the election," *see id.*, aligning with Ohio's general voter registration deadline, *see* Ohio Const. Art. V, Sec. 1; Ohio Rev. Code § 3503.19.

87.     Therefore, it appears that if a previously registered voter whose registration has been cancelled misses the 30-day deadline to request a hearing with the county board of elections—or if their registration is canceled within the 30-day window, which SB 293 not only enables, but *requires*—then the individual may be deprived of the right to vote in Ohio.

88.     Although SB 293 provides that a voter's registration cancelled in error will be restored as if never cancelled, Ex. 1 § 3503.21(F)(2), it does not purport to override the 30-day window. As a result, an individual whose registration is erroneously cancelled after the voter-registration deadline may have no timely recourse to restore it and would instead be forced to rely on casting a provisional ballot, which requires providing documentary proof of citizenship within four days following the Election, *see id.* at § 3505.182(D)(5) and, if the individual's name has changed, additional "proof of the change of name, such as a copy of a marriage license or court order," *see id.* at § 3501.01(EE)(2)—all with the hope that their provisional ballot will ultimately be counted.

89.     Thus, SB 293 makes key changes that go even above and beyond the Secretary's March 2025 Directive. First, rather than sending a confirmation notice and providing an opportunity to respond before sending the list to the county board of elections, SB 293's Purge Program eliminates the pre-deprivation confirmation notice and requires county boards to purge these voters without prior notice. While the updated guidance suggests the Secretary will provide

some notice to the voter himself, there are no details as to when the notice will be provided, what form it will take, and how long the voter has to respond before their name is sent to the boards for cancellation. *See* 2026 Directive at 145. Second, it removes the provision of state law requiring the Secretary to suspend such systematic checks 90 days before any federal election.

### III.    The Purge Program Violates Section 8 of the NVRA and the Fourteenth Amendment's Due Process Clause.

90.    The Purge Program created by SB 293 runs afoul of Section 8(c) of the National Voter Registration Act (NVRA), Section 8(b) of the NVRA, and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

91.    Section 8(c) of the NVRA, 52 U.S.C. § 20507(c), establishes a temporary "quiet period" for systematic voter list maintenance during the 90 days immediately preceding federal elections, "when the risk of dis[en]franchising eligible voters is the greatest." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). This period is critical because "[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote." *Id.*

92.    Accordingly, while voter list maintenance is generally allowed year-round, Section 8(c) prohibits "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" during the 90 days before a federal primary or general election. 52 U.S.C. § 20507(c)(2)(A).

93.    Section 8(c)'s "quiet period" only allows systematic programs to flag and remove voters during this period based on death, criminal conviction, or mental incapacity. *See* 52 U.S.C. § 20507(c)(2)(B) (cross-referencing 52 U.S.C. §§ 20507(a)(3)(A), (a)(3)(B), and (a)(4)(A)).

94.    Thus, while Section 8(c) permits removal based on "individualized information or investigation to determine" voter ineligibility during the quiet period, *Mi Familia Vota v. Fontes*, 129 F.4th 691, 716 (9th Cir. 2025) (quoting *Arcia*, 772 F.3d at 1344), it forbids a "systematic" removal program for reasons other than death, criminal conviction, or mental

incapacity. "Systematic" removal programs often involve "cancelling batches of registrations based on a set procedure such as 'us[ing] a mass computerized data-matching process to compare the voter rolls with other state and federal databases, followed by the mailing of notices.'" *Id.* (quoting *Arcia*, 772 F.3d at 1344). Thus, programs that systematically seek to remove registered voters based on their purported citizenship status are not permitted during the NVRA's "quiet period."

95.     Because the Secretary "shall" institute citizenship database reviews every month, he will necessarily institute at least two (and possibly more) systematic removal programs during the NVRA's prescribed "quiet period" under SB 293. *See* Ex. 1 § 3503.152(A).

96.     SB 293 requires the Secretary of State to conduct regular, systematic list maintenance by data matching between the voter registration database and the SAVE and BMV databases, and it mandates that county boards of elections "promptly shall cancel" registrations of voters for whom a comparison with the SAVE or BMV database flags a noncitizen notation. *See id.* § 3503.152(A), (B)(1). SB 293's monthly citizenship check program exhibits all the hallmarks of "systematic" list maintenance barred under Section 8(c). Like the programs in *Arcia* and *Mi Familia Vota*, SB 293 directs the Secretary of State to use "'a mass computerized data-matching process to compare the voter rolls with other state and federal databases'"— specifically, the Ohio BMV database and federal SAVE system—"'followed by the mailing of notices.'" *See Mi Familia Vota*, 129 F.4th at 716 (quoting *Arcia*, 772 F.3d at 1344); *see also id.* at 717 (rejecting the argument that providing "a person with mail notice and opportunity to respond" rendered a program individualized).

97.     SB 293 goes further than the program invalidated in *Mi Familia Vota* because it does not even require notice to voters prior to their registrations being cancelled. Instead, county boards of elections "promptly shall cancel" the voter's registration and only thereafter notify them of the cancellation and provide an opportunity to respond. *See* Ex. 1 §§ 3503.152(B)(1); 3503.21(F)(1).

98.      The citizenship-based Purge Program prescribed by SB 293 violates the NVRA's quiet period when removals occur within 90 days of a federal election.

99.      Additionally, Section 8(b)(1) of the NVRA requires that voter list maintenance programs be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). This provision protects against list maintenance programs that are not uniformly applied or that discriminate against, among others, naturalized citizens, including through matching names against the federal SAVE database. *See Mi Familia Vota*, 129 F.4th at 714–15.

100.     SB 293's Purge Program targets and will disproportionately sweep in naturalized citizens, as they are much more likely than citizens born in the United States to be flagged as noncitizens in the BMV database or SAVE system based on outdated data, in violation of Section 8(b)(1). Indeed, to our knowledge, the only way for a citizen born in the United States to be flagged this way would be through an error that is equally likely to affect a naturalized citizen. In contrast, naturalized citizens are subject to an additional and significantly greater risk of disenfranchisement from which U.S.-born citizens are shielded because the Purge Program was designed to rely on stale data.

101.     Finally, SB 293 violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which mandates that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

102.     SB 293 deprives naturalized citizens of their liberty interest in remaining registered to vote without any pre-deprivation notice and an opportunity to be heard. SB 293 includes neither procedural safeguards to notify voters who are identified by the citizenship database matching process before being removed from the rolls nor a pre-removal opportunity to be heard on the issue if they were erroneously identified as a noncitizen. Instead, upon being identified in a citizenship database check, the county boards of elections "*promptly shall* cancel the person's voter registration" without any prior notice to the voter. *See* Ex. 1 § 3503.152(B)(1) (emphasis added).

103.     All eligible citizens, including naturalized citizens, have a fundamental constitutional right to vote and a constitutionally protected liberty interest in doing so. The risk of erroneous deprivation to an eligible voter's right to vote from SB 293's Purge Program is significant because the BMV and SAVE databases are likely to produce inaccurate data on citizenship. The State's interest in removing voters without any prior notice or opportunity to contest the cancellation is minimal. If anything, the State's interest in verifying voters' eligibility to safeguard against voter fraud and preserve public confidence in elections would be promoted by providing proper notice and opportunity to address whether the registered voter is a citizen, which would improve voter roll accuracy.

### IV.     Plaintiffs Provided Timely Notice to the Secretary of State that SB 293 Violates the NVRA.

104.     On January 22, 2026, Plaintiffs, through their counsel, sent a letter via certified mail and email to Secretary LaRose, notifying him that the State of Ohio was failing to meet its obligations under Section 8 of the NVRA.

105.     This letter stated that Plaintiffs were providing notice of their intent to sue for the violations of Section 8 of the NVRA described, unless the violations were corrected within the notice period prescribed by the NVRA.

106.     Upon information and belief, the Secretary has not taken the steps necessary to remedy the State's noncompliance with Section 8 of the NVRA.

107.     More than twenty days have elapsed since the NVRA notice letter was sent.[19]

108.     The next "election for Federal office" in Ohio will occur on May 5, 2026, which is less than 120 days from today (February 13, 2026).[20]

---

[19] The National Voter Registration Act (NVRA) requires individuals to provide states with notice of alleged violations under the Act prior to instituting a suit. The NVRA provides that "[i]f the violation is not corrected within . . . 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." 52 U.S.C. § 20510(b)(2).

[20] *See 2026 Elections Calendar*, Ohio Sec'y of State (last visited Jan. 27, 2026), https://www.ohiosos.gov/globalassets/publications/election/2026electionscalendar_11x17.pdf.

109. Plaintiffs have therefore provided adequate pre-suit notice pursuant to 52 U.S.C. § 20510(b)(2). *See Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997).

## CLAIMS FOR RELIEF

### Count One

### Violation of Section 8(c) of the National Voter Registration Act, 52 U.S.C. § 20507(c)(2)(A)
(52 U.S.C. § 20510)

110. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

111. Section 8(c) of the NVRA prohibits a state from conducting "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" "not later than 90 days prior to the date of a[n] . . . election for Federal office." 52 U.S.C. § 20507(c)(2)(A). This 90-day prohibition—commonly known as the NVRA's "quiet period"—bars states from taking steps to systematically remove voters during that time other than based on death, mental disability, or criminal conviction. *See Arcia*, 772 F.3d at 1346.

112. SB 293 violates the NVRA's quiet period because it mandates ongoing, regular, and systematic citizenship-based list maintenance throughout the year, including during the 90 days preceding a federal election. Specifically, SB 293 requires the Secretary of State to conduct monthly comparisons of voter registration records against the SAVE and BMV databases and to "promptly" remove registrants identified as potential noncitizens—without any exemption for the quiet period. Ex. 1 § 3503.152(A), (B)(1).

113. SB 293 requires practices that violate the NVRA's quiet period, which will irreparably harm voters by leading them to be removed from the rolls without the amount of time Congress has deemed necessary to rectify improper removal before the next election, and thus will likely deprive them of their right to vote.

## Count Two

**Violation of Section 8(b) of the National Voter Registration Act, 52 U.S.C. § 20507(b)(1)**
(52 U.S.C. § 20510)

114.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

115.     Section 8(b)(1) of the NVRA requires that voter list maintenance programs be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1).

116.     This requirement prohibits list maintenance programs that disproportionately burden or target protected classes of eligible voters, including naturalized citizens. Citizenship-based matching programs relying on databases known to contain stale or unreliable citizenship data—such as the SAVE system—pose heightened risks to naturalized citizens, who were previously noncitizens and therefore are more likely to be erroneously flagged when government records fail to reflect updated citizenship status. *See Mi Familia Vota*, 129 F.4th at 714–15.

117.     SB 293 violates the NVRA's uniformity and nondiscrimination requirements because it mandates list maintenance programs that rely on databases or systems known to contain stale or unreliable citizenship data, including the BMV database and the SAVE system, to identify and initiate removal proceedings against registered voters. Ex. 1 § 3503.152(A)(2), (B)(1)–(2).

118.     Upon information and belief, SB 293's directed use of Ohio's BMV database matching will raise substantial risks of disenfranchisement that will discriminatorily burden naturalized voters because of the lag in BMV data associated with four- to eight-year license and state ID card renewals, as well as the database's inability to update subsequent naturalization status without voter-initiated contact.

119.     SB 293's directed use of the federal SAVE system will raise substantial risks of disenfranchisement due to inaccurate data entries or stale data, with discriminatory effects suffered by naturalized citizens and not by U.S.-born citizens. SB 293 therefore establishes a voter list maintenance program that is neither uniform nor nondiscriminatory, in violation of Section 8(b)(1) of the NVRA, 52 U.S.C. § 20507(b)(1).

120.     SB 293 thereby subjects naturalized citizen voters, including League and CAIR-N.O. members, to the irreparable harm of facing unlawful discrimination on the basis of their status as naturalized citizens.

### Count Three
### Violation of the Fourteenth Amendment – Due Process Clause
(U.S. Const. amend. XIV § 1; 42 U.S.C. § 1983)

121.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

122.     The Fourteenth Amendment's Due Process Clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Clause guarantees notice and an opportunity to be heard before the deprivation of a protected liberty interest. *See Hieber v. Oakland Cnty.*, 136 F.4th 308, 320–21 (6th Cir. 2024) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)).

123.     Under *Mathews v. Eldridge*, courts determine what notice and hearing are constitutionally required by balancing (1) the private interests at stake, (2) the risk of erroneous deprivation under the procedures used and the probable value of additional safeguards, and (3) the government's asserted interests. 424 U.S. 319, 335 (1976).

124.     Ohio law and the First Amendment confer upon eligible citizens a protected liberty interest in voting, an interest safeguarded by the Fourteenth Amendment's procedural due process guarantees. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (a protected liberty interest may arise from the Constitution itself or from interests created by state law).

125.     SB 293 violates procedural due process because it authorizes the cancellation of a voter's registration based solely on the State's receipt of a report identifying the voter as a noncitizen—reports generated through administrative-database checks using stale data—and directs election officials to "promptly" cancel the voter's registration. The statute does not provide the voter with prior notice, a meaningful opportunity to contest the determination, or any opportunity to cure erroneous or outdated information before the cancelation occurs, *see* Ex. 1

§§ 3503.21(A)(9), 3503.152(B)(1). Only after the voter's registration has been cancelled do they receive notice and an opportunity to respond, unlike voters flagged through other list maintenance processes, *see* Ex. 1 § 3503.21(A)(7) (describing how a voter who received a confirmation notice due to a filed request for a canceled registration, a notice of a death or conviction, an adjudication of incompetence, or a change in residency can avoid cancellation of their registration by responding or updating their registration and voting over the following four years). The vague guidance regarding notice in the EOM contradicts the statutory language and is insufficient to resolve SB 293's procedural defects. *See supra* ¶ 85.

126. SB 293's procedures are constitutionally deficient under *Mathews*. The private interest in maintaining voter registration is fundamental; the risk of erroneous deprivation is substantial given the statute's reliance on imperfect citizenship databases; and the State's administrative interests do not justify the complete absence of notice or an opportunity to be heard before being deprived of that interest. SB 293 therefore violates the Fourteenth Amendment's Due Process Clause and will irreparably injure Plaintiffs' members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment providing the following relief:

(a) Declare that SB 293 violates Sections 8(b) and 8(c) of the NVRA, as well as the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

(b) Permanently enjoin the Secretary from implementing and enforcing the challenged provisions of SB 293, including but not limited to: (i) prohibiting the Secretary from sending county boards of elections lists of voters to remove based on information in the SAVE system or BMV database without sufficient prior notice to the voter and opportunity to respond; (ii) prohibiting the Secretary from engaging in any systematic activity to remove voters based on purported non-citizenship within 90 days of a federal election; and (iii) prohibiting the Secretary

from removing individuals from the voter registration list solely because they have been flagged as noncitizens by the SAVE system and/or BMV database.

      (c)    Grant Plaintiffs their fees, costs, and expenses, including reasonable attorneys' fees pursuant to 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988.

      (d)    Grant Plaintiffs such additional and further relief as this Court deems just and proper.

Respectfully Submitted,

Dated: February 13, 2026

/s/ *Freda J. Levenson*
Freda J. Levenson    (0045916)
(*Trial Attorney*)
Amy Gilbert    (0100887)
ACLU OF OHIO FOUNDATION, INC.
4506 Chester Avenue
Cleveland, Ohio 44103
(216) 541-1376
flevenson@acluohio.org
agilbert@acluohio.org

David J. Carey    (0088787)
Carlen Zhang-D'Souza (0093079)
ACLU OF OHIO FOUNDATION, INC.
1108 City Park Avenue, Suite 203
Columbus, Ohio 43206
(380) 215-1972
dcarey@acluohio.org
czhangdsouza@acluohio.org

Davin Rosborough*
Ethan Herenstein*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
eherenstein@aclu.org

Anna Baldwin*
Sejal Jhaveri (NY Bar. # 5396304)
Kate Hamilton*
Kate Uyeda*
Brendan Nigro*
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
abaldwin@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
kuyeda@campaignlegalcenter.org
bnigro@campaignlegalcenter.org

Patricia Yan*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th St. NW
Washington, DC 20001
(212) 549-2500
pyan@aclu.org

*Counsel for Plaintiffs League of Women Voters of Ohio and Council on American-Islamic Relations of Northern Ohio*

\* Applications for admission *pro hac vice* forthcoming