**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **LEAGUE OF WOMEN VOTERS OF OHIO, and COUNCIL ON AMERICAN-ISLAMIC RELATIONS – NORTHERN OHIO,** | : : : : : | |
| | : | **Case No. 2:26-cv-177** |
| **Plaintiffs,** | : | |
| | : | **Judge Michael H. Watson** |
| **v.** | : | |
| | : | **Mag. Judge S. Courter M. Shimeall** |
| | : | |
| | : | |
| **FRANK LAROSE, in his official capacity as Ohio Secretary of State,** | : : | |
| | : | |
| | : | |
| **Defendant.** | : | |

---

**DEFENDANT'S MOTION TO DISMISS**

---

Under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants respectfully move

this Court to dismiss this case. Because Plaintiffs lack standing, this Court lacks jurisdiction.

Furthermore, Plaintiffs fail to state any valid claims for relief. A more detailed explanation of the

reasons for this Motion can be found in the attached Memorandum in Support.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Ann Yackshaw*
ANN YACKSHAW (0090623)*
*\*Counsel of Record*
JULIE M. PFEIFFER (0069792)
STEPHEN P. TABATOWSKI (0099175)
GREGORY A. RUSTICO (0104103)
TYLER W. BLAIR (0095595)

Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Ann.Yackshaw@OhioAGO.gov
Julie.Pfeiffer@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov
Gregory.Rustico@OhioAGO.gov
Tyler.Blair@OhioAGO.gov

*Counsel for Defendant*

## MEMORANDUM IN SUPPORT

## INTRODUCTION

This Court does not "operate as an open forum for citizens to press general complaints about the way in which government goes about its business." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (cleaned up). Yet that is precisely the kind of generalized grievance this lawsuit presents. A pair of citizen-activism organizations urge this Court to scrutinize Ohio's routine review of its voter rolls to identify noncitizens. But they lack standing to do so. Plaintiffs ask this Court to wade into a public policy dispute without identifying a single member of their organizations who faces a concrete injury or any organizational harm traceable to the challenged statute, S.B. 293. Instead, their claims rely on conjecture, misreadings of the operative statutes and regulations, and voluntary diversions of resources—precisely the sort of "self-inflicted" injuries based on "speculative fears" that the Supreme Court and Sixth Circuit have recently rejected. Because Plaintiffs can neither "spend their way into standing" nor manufacture it through fears of hypothetical harms, they lack standing, and this Court lacks jurisdiction.

But even assuming Plaintiffs have standing, all three of their claims rest on an overbroad reading of the relevant statutes, which this Court need not accept. First, they interpret S.B. 293 as requiring automatic and immediate removals of registered voters every month without notice, based solely on two citizenship databases. The statute simply does not require that, and existing regulations refute this interpretation. This overreading leads Plaintiffs to see NVRA and Due Process Clause violations that are not there. Next, they read the NVRA's "uniform and nondiscriminatory" provision to authorize disparate impact suits. But again, the NVRA does not say that. Plaintiffs construct strawmen and knock them down, but more is required to state a claim. When the Court sweeps away these errant legal conclusions, all that remains are allegations insufficient to clear Rule 12(b)(6).

1

**BACKGROUND**

Under both federal and state law, only United States citizens are eligible to register and vote in state and federal elections. 18 U.S.C. § 611; Ohio Const. art. V, § 1. To effectuate this mandate, Ohio takes steps to ensure that only U.S. citizens are on the voter rolls—just as it ensures other eligibility criteria are met. *See* Ohio Rev. Code ch. 3503. For instance, Ohio law previously required Defendant, the Ohio Secretary of State, to check the voter rolls annually against information from the Bureau of Motor Vehicles ("BMV"). Ohio Rev. Code § 3503.152(A) (2023). The BMV database is particularly helpful for distinguishing between citizens and noncitizens because all Ohioans wishing to obtain a driver's license or state identification card must present documentary proof of their status as a citizen, permanent resident, or temporary resident of the United States. *See* Ohio Admin. Code § 4501:1-1-21(C). A newly naturalized citizen can generally obtain a new driver's license or identification card denoting their citizenship status free of charge. *See* Ohio Rev. Code § 4507.233.

Late last year, the Ohio General Assembly updated these safeguards. *See* Sub. S.B. 293, 136th Gen. Assemb. (Ohio 2025). Under the new version of § 3503.152, as amended by S.B. 293, Defendant is required to check the statewide voter registration database at least monthly by consulting the information from the BMV, as well as the Systematic Alien Verification for Entitlements ("SAVE") program, which is operated by the U.S. Department of Homeland Security. Ohio Rev. Code § 3503.152(A) (2026).[1]

Although the statute instructs Defendant to consult the BMV and SAVE databases, it gives him discretion to fashion the process for conducting these monthly "reviews." *See id.* Because

---

[1] It is worth noting that when S.B. 293 was passed, Defendant had already begun using the SAVE system under a settlement agreement with the U.S. Department of Homeland Security. *See State of Florida v. U.S. Dep't of Homeland Sec.*, No. 3:24-cv-509 (N.D. Fla. Dec. 1, 2025) (order accepting settlement agreement); Compl. ¶ 66, Dkt. 1 at PageID 15.

2

S.B. 293 has not yet taken effect, Defendant has not published the precise process he will use to conduct the monthly reviews. But those additional steps are outlined, at least in part, in the Ohio Election Official Manual ("EOM").[2] As the EOM explains, Defendant sends notices to "confirmed" noncitizens, who are then given an opportunity to provide proof of citizenship. Ohio Election Official Manual, Chapter 4: Voter Registration, at 4-145, https://www.ohiosos.gov/assets/dir2026-06-ch04.pdf. If and only if such proof of citizenship is not provided, Defendant will direct a board of elections to remove the registration. *Id.* This process remains unchanged by S.B. 293. *See* Ohio Sec'y of State, Directive 2026-02: Implementation of Substitute Senate Bill 293, at 16 (Jan. 15, 2026), https://www.ohiosos.gov/assets/directive-2026-02-implementation-of-sb-293.pdf.

Following each review required by S.B. 293, Defendant is instructed to send a report to each board of elections listing any noncitizens on their voter rolls. *See* Ohio Rev. Code § 3503.153(B)(1) (2026). The board, in turn, "promptly shall cancel the person's voter registration." *Id.* This is consistent with the current process outlined in the EOM and described above. Following a cancellation, the individual remains free to cast a provisional ballot and/or request a hearing and administrative appeal to prove their citizenship. EOM at 4-146. If a registration is ever removed in error, the registration will be restored as if it were never cancelled. *Id.*; Ohio Rev. Code § 3503.21(F)(2).

---

[2] This Court may take judicial notice of administrative rules and regulations that are outside the Complaint's four corners. *Hughes v. City of Wayne*, No. 22-1178, 2023 U.S. App. LEXIS 10201, at *11 (6th Cir. Apr. 26, 2023); *see also MSP Recovery Claims, Series LLC v. Nationwide Mut. Ins. Co.*, No. 2:21-cv-1901, 2023 U.S. Dist. LEXIS 184478, at *5 (S.D. Ohio Oct. 13, 2023) (Waston, J.) (taking judicial notice of a government website). The Ohio Election Official Manual is a publicly available permanent directive issued by Defendant to the boards of elections, subject to notice and comment. *See* Ohio Rev. Code §§ 3501.05(B), 3501.053. Its "accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Plaintiffs cite to it as well. *E.g.*, Compl. ¶ 85, Dkt. 1 at PageID 19.

3

In response to these statutory changes, a pair of nonprofit organizations filed this suit, alleging violations of the National Voter Registration Act ("NVRA") and the Fourteenth Amendment. The first plaintiff, the League of Women Voters of Ohio, "work[s] to protect and expand voting rights and ensure everyone is represented in our democracy." Compl. ¶ 12, Dkt. 1 at PageID 3. The League asserts S.B. 293 "will hamper [its] core voter-registration and voter-support efforts and force it to divert additional resources to mitigate the law's effects and educate voters about them." Compl. ¶ 14, Dkt. 1 at PageID 4. Specifically, the League believes it "will be forced to divert resources from its core voter-engagement activities to educate voters, especially naturalized citizen voters, on how to avoid erroneous removal from Ohio's official list of eligible voters, and, if removed, on how to attempt to re-register in time to vote." Compl. ¶ 16, Dkt. 1 at PageID 4. The League alleges it "must" spend time at its meetings "planning programming and education" regarding the new statutory scheme, time that it would have spent on "other voter service priorities." Compl. ¶ 20, Dkt. 1 at PageID 5. The League also claims it "will have to expend resources to revise all of its informational materials." Compl. ¶ 22, Dkt. 1 at PageID 5.

The second plaintiff, the Council on American-Islamic Relations of Northern Ohio, is a Muslim civil rights organization whose asserted mission is to "enhance the American public's understanding of Islam, protect civil rights, promote justice, and empower American Muslims." Compl. ¶¶ 23, 24, Dkt. 1 at PageID 5–6. Among the Council's purported "core principles" is "protecting the rights of eligible voters to register to vote and to vote in Ohio." Compl. ¶ 24, Dkt. 1 at PageID 6. The Council says it "dedicates a significant proportion of its resources to voter-engagement work, including the registration of naturalized citizens." Compl. ¶ 25, Dkt. 1 at PageID 6. Because of S.B. 293, the Council believes it "will be forced to divert resources it would otherwise spend on its core voter-engagement activities." Compl. ¶ 25, Dkt. 1 at PageID 6.

4

Plaintiffs interpret S.B. 293 broadly. In sum, they believe S.B. 293 requires monthly systematic removals without notice, based solely on the BMV and SAVE databases. *See* Compl. ¶¶ 60, 70, 79–82, Dkt. 1 at PageID 13, 16–18. For instance, Plaintiffs read the statute's "promptly shall cancel" language to supersede the existing notice-and-cure scheme found in the EOM. Compl. ¶¶ 82, 84, Dkt. 1 at PageID 18. Likewise, Plaintiffs read the statute's instruction to conduct database checks "on at least a monthly basis" to require blanket removals every month. Compl. ¶ 82.

Relying on this expansive interpretation of S.B. 293, Plaintiffs raise three claims. They argue the statute (1) violates the NVRA's quiet-period provision by requiring "systematic" removals within 90 days of a federal election; (2) violates the NVRA's "uniform" and "nondiscriminatory" requirement for list maintenance programs; and (3) violates the Due Process Clause of the Fourteenth Amendment by cancelling voter registrations without prior notice. Compl. ¶¶ 110–126, Dkt. 1 at PageID 24–27.

## LAW AND ARGUMENT

A. **Motions under Rule 12(b)(6) and facial attacks under Rule 12(b)(1) employ the same legal standard.**

"A facial attack [under Rule 12(b)(1)] goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (citation omitted). "This approach is identical to the approach used by the district court when reviewing a motion invoking Federal Rule of Civil Procedure 12(b)(6)." *Glob. Tech., Inc. v. Yubei (Xinxiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015) (citation omitted).

B. **Standing is a jurisdictional prerequisite, and organizations may assert standing in two ways.**

"[Federal courts] do not have a standalone power to evaluate the constitutionality of every law passed by [a legislature] . . . ." *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 536

5

(6th Cir. 2021) (citing *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 146 (2011)). Federal jurisdiction is limited to deciding "Cases" or "Controversies" between litigants. U.S. Const. art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 560–61 (1992)).

"An organization may have standing in two forms: (1) associational standing, where it alleges an injury to its members and sues on their behalf; and (2) organizational standing, where it alleges an injury to the organization itself and sues on its own behalf." *Am. Marriage Ministries v. Collins*, 781 F. Supp. 3d 669 (E.D. Tenn. 2025) (citing *All. for Hippocratic Med.*, 602 U.S. at 393); *accord Online Merchs. Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021). Regardless of the theory asserted, the plaintiff bears the burden of establishing standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

**C.      Plaintiffs lack associational standing because they have failed to identify any representative members who would themselves have standing.**

Associational standing "sometimes permits an entity to sue over injuries suffered by its members." *Ass'n of Am. Physicians*, 13 F.4th at 537. This form of third-party standing has been circumscribed in recent years, and its continued viability has been questioned. *See id.* at 537–42. Nevertheless, under current law, an organization may establish associational standing if it satisfies three elements: "(1) its 'members would otherwise have standing to sue in their own right'; (2) the 'interests' that the suit 'seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the

6

lawsuit.'" *Id.* at 537 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). But "an organization must do more than identify a likelihood that the defendant's conduct will harm an unknown member in light of the organization's extensive size or membership base." *Id.* at 543 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009)). "The organization must instead identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct." *Id.*

For instance, in *Association of American Physicians*, the plaintiff organization identified two members whom it believed were harmed by the FDA's restrictions on their ability to prescribe hydrochloroquine. *Id.* The Sixth Circuit disagreed because the doctors had misinterpreted the FDA's rules, which did not actually harm their ability to prescribe hydrochloroquine. *Id.* at 544–45.

Here, it is not entirely clear if Plaintiffs are seeking to assert associational standing. But even if they are, they have failed. At the outset, this Court can disregard Plaintiffs' generalized allegations about the size of their groups and how their membership rolls "include[] naturalized citizens who are especially vulnerable to being improperly flagged and removed" under S.B. 293, Compl. ¶ 13, Dkt. 1 at PageID 3, because "an organization must do more than identify a likelihood that the defendant's conduct will harm an unknown member," *Ass'n of Am. Physicians*, 13 F.4th at 543.

That leaves the sole member from either group identified in the Complaint, Jona Hilario. Plaintiffs allege she is a member of the League and "a naturalized citizen who was improperly flagged in a 2024 election audit conducted by Secretary LaRose." Compl. ¶ 13, Dkt. 1 at PageID 3–4. But much like the two doctors identified in *Association of American Physicians*, Ms. Hilario would lack standing in her own right because she is not injured by the challenged policy. By her own admission, Ms. Hilario's registration was previously flagged and presumably corrected and restored, considering she is identified as an "Ohio registered voter." Compl. ¶ 13, Dkt. 1 at PageID 3–4. This

7

makes her perhaps the member least likely to be injured by S.B. 293 because her citizenship records have already been updated.

Since Plaintiffs have failed to identify any members who could establish standing to sue on their own behalf, Plaintiffs lack associational standing. *See Ass'n of Am. Physicians*, 13 F.4th at 537.

**D.     Plaintiffs' allegations of voluntary diversions of resources to ameliorate speculative harms are not enough to establish organizational standing.**

In addition to suing on behalf of its members, "organizations may have standing 'to sue on their own behalf for injuries they have sustained.'" *All. for Hippocratic Med.*, 602 U.S. at 393 (quoting *Havens Realty Corp. v. Coleman*, 455 U. S. 363, 379 n.19 (1982)). "[A]n organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct." *id.* (cleaned up). "[O]nly 'concrete' and 'particularized' injuries—such as economic or physical harms—will suffice." *Tenn. Conf. of the NAACP v. Lee*, 139 F.4th 557, 562 (6th Cir. 2025) (quoting *TransUnion*, 594 U.S. at 423, 425).

One theory of economic harm used in the past was an organization's diversion of resources in response to a challenged law or action. This approach was derived from *Havens Realty*, where the Supreme Court held a housing counseling and referral service had standing to sue a realty company that was steering African Americans away from its apartments. 455 U.S. at 366–70.

This diversion-of-resources theory proliferated until the Supreme Court, in *Alliance for Hippocratic Medicine*, greatly constrained its application. There, pro-life medical associations challenged the FDA's regulations of an abortion-inducing drug. 602 U.S. at 376. The organizations asserted standing because the FDA had "'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education . . . . to the detriment of other spending priorities." *Id.* at 394. The Court rejected this argument, explaining that the diversion-of-resources theory from *Havens Realty* applies only

8

where the challenged conduct "directly affected and interfered with [the plaintiff's] core business activities." *Id.* at 395.

In the wake of *Alliance for Hippocratic Medicine*, the Sixth Circuit tackled a diversion-of-resources standing claim under the NVRA. In *Tennessee Conference of the NAACP*, the NAACP challenged a policy requiring individuals with criminal convictions to produce additional documents to register to vote. 139 F.4th at 559, 565. The NAACP argued that "promoting voter registration and turnout" was among its core missions, and it would have to "divert significant resources" to assist applicants in "present[ing] additional paperwork." *Id.* at 565. Although the court ultimately found the standing allegations factually insufficient to survive a motion for summary judgment, it expressed doubts about whether this diversion-of-resources theory of standing could ever suffice post *Alliance for Hippocratic Medicine. See, e.g.*, *id.* at 565 ("[O]rganizations cannot 'spend their way into standing' by voluntarily using resources to counter the government action." (quoting *All. for Hippocratic Med.*, 602 U.S. at 394)); *id.* at 564, 566 (questioning whether a diversion of resources for "public education" is sufficient to establish organizational standing).

Turning to this case, the League's and the Council's claims for organizational standing are functionally identical. Both allege they "dedicate[] a significant proportion of [their] resources to voter-engagement work, including voter registration." Compl. ¶¶ 14, 25, Dkt. 1 at PageID 4, 6. Likewise, they both allege that because of the law, they "will be forced to divert resources from [their] core voter-engagement activities to educate voters," and "devote time and resources to avoid, and try to correct, wrongful removals . . . divert[ing] time and resources from the other critical voter service problems." Compl. ¶¶ 16, 21, 25–26, Dkt. 1 at PageID 4–6.

These allegations, even when accepted as true, fail to establish organizational standing for at least three reasons. First, Plaintiffs have failed to demonstrate a legally cognizable injury to their organizations. Plaintiffs allege that they assist the public in registering to vote, and the changes made

9

by S.B. 293 could affect these assistance programs. *See, e.g.*, Compl. ¶¶ 14–21, 25–29, Dkt. 1 at PageID 4–7. But "[c]ontinuing to do something an organization already does, even in a newly modified manner," is not sufficient to establish standing after *Alliance for Hippocratic Medicine. Equal. State Pol'y Ctr. v. Gray*, 1:25-cv-117 (D. Wyo. July 22, 2025), attached as Ex. A, at 10 (citing *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459–60 (6th Cir. 2014) ("[I]t is not an injury to instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already . . . .")). If taken to its logical conclusion, Plaintiff's theory would grant them standing every time any aspect of election procedure changes. For instance, Plaintiffs presumably must update their education materials with new dates for every election. *See* Compl. ¶¶ 22, Dkt. 1 at PageID 5 (discussing changes to voter education materials). Surely this kind of minimal diversion of resources is insufficient to create standing after *Alliance for Hippocratic Medicine. See Tenn. Conf. of the NAACP*, 139 F.4th at 564, 566 (discussing "public education" efforts).

Second, Plaintiffs' alleged harms are purely speculative, rather than imminent. In *Tennessee Conference of the NAACP*, the Court admonished the plaintiffs for offering little more than "'speculative fears' that they may suffer harm." 139 F.4th at 568 (quoting *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020)). The fears were speculative because the NAACP attempted to "rely on a 'statistical probability' theory of standing tied to the claim that it [would] likely encounter applicants . . . who need its help." *Id.* at 567. Here, Plaintiffs offer a flavor of this same argument. They allege that they are likely to encounter scores of voters who are improperly removed from the voter rolls under S.B. 293, but they offer no examples or evidence to support those claims. *See, e.g.*, Compl. ¶ 16, Dkt. 1 at PageID 4. Instead, Plaintiffs use the text of S.B. 293 to construct a boogeyman in their minds that they believe will harm them. *See, e.g.*, Compl. ¶ 69, Dkt. 1 at PageID 16 (dubbing S.B. 293 a "Purge Program"); *see also infra* Section E (discussing

10

Plaintiffs' overbroad reading of S.B. 293). But just as these "speculative fears" were insufficient in *Tennessee Conference of the NAACP*, they are insufficient here.

Third, Plaintiffs cannot sufficiently trace their alleged injuries to S.B. 293. Despite their allegations that they "must" or have been "forced to" divert resources to respond to S.B. 293, those decisions remain voluntary, and thus their injuries will necessarily be "self-inflicted." *Tenn. Conf. of the NAACP*, 139 F.4th at 564; *see also id.* (noting that in *Alliance for Hippocratic Medicine*, "the associations' *voluntary decision* to spend time and money opposing the FDA's actions broke any causal link between their expenditures and the challenged actions"). Plaintiffs are unable to walk the causation tightrope created by *Alliance for Hippocratic Medicine*. Gone are the days when plaintiffs could simply "spend their way into standing" in this way. *All. for Hippocratic Med.*, 602 U.S. at 394. Even accepting Plaintiffs' allegations that their "core mission[s]" include helping with voter registration, S.B. 293 does not "*directly* affect[] and interfere[]" with those missions by forcing a diversion of resources.  *Id.* at 395 (emphasis added). Rather, it is Plaintiffs' responses to speculative fears of S.B. 293, based on a misinterpretation of its scope, that have caused the diversion of resources.  These "voluntary decision[s]" by Plaintiffs "broke any causal link between their expenditures and [S.B. 293]." *Tenn. Conf. of the NAACP*, 139 F.4th at 564.

Additionally, it is worth noting that *Tennessee Conference of the NAACP* cast doubt on whether organizational standing could ever be available under the NVRA, even under a diversion-of-resources theory. *Id.* at 568–69. The NVRA permits "[a] person who is aggrieved by a violation" to sue. 52 U.S.C. § 20510(b)(1). But considering organizations do not have a right to vote or register to vote, it is not clear how organizations such as Plaintiffs could ever fall "within the zone of interest protected by" the NVRA. *Id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)).

11

At the end of the day, it is worth remembering that the standing requirements derived from Article III "prevent[] the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'" *All. for Hippocratic Med.*, 602 U.S. at 382 (quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984)). Plaintiffs are precisely that: concerned citizens with strong opinions about voter registration procedures. But their level of interest and consequent self-inflicted diversion of resources to tackle speculative harms do not confer standing. Because "organizations cannot 'spend their way into standing' by voluntarily using resources to counter the government action," Plaintiffs lack organizational standing, and this Court lacks jurisdiction. *Tenn. Conf. of the NAACP*, 139 F.4th at 565 (quoting *All. for Hippocratic Med.*, 602 U.S. at 394).

**E.      Even if Plaintiffs have standing, they fail to state a valid claim.**

**1.      Count I: Because S.B. 293 can be read in harmony with the NVRA's quiet-period provision, Plaintiffs fail to state a claim.**

States generally bear responsibility for the mechanics of congressional elections, but Congress may act to preempt state legislative choices that directly conflict with federal law. *See Foster v. Love*, 522 U.S. 67, 69 (1997). As a general matter, federal preemption of state law is the exception, not the rule. *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 565 & n.3 (2009). This is in keeping with the Constitution's presumption in favor of states making decisions about how to conduct elections. *See* U.S. Const. art. I, § 4, cl. 1; *Shelby Cnty. v. Holder*, 570 U.S. 529, 543 (2013) ("[T]he Framers of the Constitution intended the States to keep . . . the power to regulate elections." (citations and quotation omitted)).

Conflict preemption, the only preemption category relevant here, exists where "compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v.*

*Learjet, Inc.*, 575 U.S. 373, 377 (2015) (citation and quotation marks omitted); *see Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (employing conflict preemption in an NVRA case).

The NVRA's quiet-period provision requires that states "shall complete, not later than 90 days prior to [a federal election] . . . any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A).

S.B. 293 requires Defendant to "conduct reviews of the statewide voter registration database on at least a monthly basis to identify persons who are not United States citizens by consulting" the BMV and SAVE databases. Ohio Rev. Code § 3503.152(A)(1)–(2). "Following each review conducted under this section," Defendant must "[s]end a report to each board of elections of each person in the county who, according to the databases . . . is not a United States citizen." *Id.* § 3503.152(B)(1).

Plaintiffs read these provisions to conflict. But recall, conflict preemption exists only where compliance with both state and federal law is "impossible," or the state law frustrates Congress's purpose. *Oneok*, 575 U.S. at 377. Because the two statutes can be read in a way that does not conflict or frustrate congressional intent, there is no preemption and thus no violation of the NVRA. This is so for at least three reasons: (1) the monthly reviews required under S.B. 293 are not necessarily "systematic"; (2) the quiet-period provision does not apply to noncitizens; and (3) S.B. 293 does not frustrate the NVRA's purpose.

First, S.B. 293 requires that Defendant's monthly checks include consultation of the BMV and SAVE databases, but it does not require him to stop there. Just because Defendant must consult these databases, it does not logically follow that this consultation must be the only step in his reviews. The statute is silent on the issue: it does not require more steps, but it does not forbid them either. Thus, compliance with both the NVRA and S.B. 293 is not "impossible." S.B. 293's silence can be plausibly read to permit Defendant the discretion to conduct individualized monthly reviews. *Cf.*

13

*Price v. Bd. of the Ind. Laborer's Pension Fund*, 531 F. App'x 535, 536 (6th Cir. 2013) ("Silence equals ambiguity; ambiguity equals discretion . . . ."). In fact, the EOM demonstrates that Defendant has employed this discretion to conduct individualized inquiries, and his recent directive confirms that he will continue to do so. EOM at 4-145–46; Directive 2026-02 at 16.

Second, even if such reviews were systematic, the NVRA quiet-period provision does not apply to noncitizens. That provision limits the removal of "ineligible voters." 52 U.S.C. § 20507(c)(2)(A). But to become a "voter[]" in the first instance, an individual must be an "eligible applicant" for registration. *Id.* § 20507(a)(1). A noncitizen, of course, is never an "eligible applicant," *see* 18 U.S.C. § 611, and thus cannot become a "voter[]" covered by the quiet-period provision. The terms "ineligible voters" and "eligible voters" in the quiet-period provision presuppose individuals who were properly registered before becoming disqualified for some reason. Noncitizens therefore fall outside the provision's protections. The same would be true for other never-eligible individuals, such as minors. This reading is consistent with existing Sixth Circuit precedent: "Congress did not intend to bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place." *Bell v. Marinko*, 367 F.3d 588, 591–92 (6th Cir. 2004). Because noncitizens were never "eligible applicant[s]" and thus could not become "registrant[s]" or "voters" under the NVRA in the first place, their removal is not governed by the quiet-period provision.  Thus, the NVRA quiet-period provision does not conflict with or preempt S.B. 293.

Third, S.B. 293 can be implemented in a way that does not frustrate the "accomplishment and execution of the full purposes and objectives" of the NVRA. *Oneok*, 575 U.S. at 377. S.B. 293 requires Defendant to review Ohio's voter rolls, compare them to available databases, and cancel voter registration for confirmed noncitizens after providing them notice and an opportunity to show proof of citizenship. This aligns with the NVRA's stated purposes of protecting election integrity,

14

ensuring accurate and current voter registration rolls, and increasing eligible voter registration and participation. *See* 52 U.S.C. § 20501(b)(1)–(4).

Plaintiff's citations to *Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025), do not alter this conclusion. Compl. ¶¶ 94, 96, Dkt. 1 at PageID 20–21. This out-of-circuit precedent conflicts with existing Sixth Circuit precedent on the NVRA: "Congress did not intend to bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place." *Bell*, 367 F.3d at 591–92; *see also Mi Familia Vota*, 129 F.4th at 757 (Bumatay, J., dissenting) (acknowledging the circuit split). Even the *Mi Familia Vota* court acknowledged that a "non-systematic or 'individualized' removal program" is permitted, so long as it "relies on 'individualized information or investigation' to determine removal of ineligible voters from voting rolls." 129 F.4th at 716 (quoting *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014)). Defendant's existing review scheme is individualized, and S.B. 293 can be read in a way that does not change that. *See* EOM at 4-145–46; Directive 2026-02 at 16.

Because S.B. 293 can be read in harmony with the NVRA's quiet-period provision, there is no conflict preemption and thus no violation. This Court should dismiss Count I.

### 2. Count II: Plaintiffs' uniform-and-nondiscriminatory claim fails because that section does not permit disparate-impact claims.

Plaintiffs argue that S.B. 293 violates the uniform-and-nondiscriminatory provision of the NVRA, 52 U.S.C. § 20507(b)(1). In making this claim, Plaintiffs do not argue that S.B. 293 discriminates on its face. Nor do they argue that the General Assembly intended to discriminate against anyone. Rather, Plaintiffs say that S.B. 293 will expose naturalized citizens to a greater risk of cancellation than their U.S.-born counterparts. *See, e.g.*, Compl. ¶ 118, Dkt. 1 at PageID 25 (alleging that S.B. 293 will "raise substantial risks of disenfranchisement that will discriminatorily burden naturalized voters"). These differential effects, they say, amount to unlawful discrimination

15

under the NVRA. Implicit in this claim is an assumption that the NVRA permits disparate-impact claims. It does not, and Plaintiffs' uniform-and-discriminatory claim therefore fails as a matter of law.

Under the NVRA, a state's list-maintenance program must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b)(1). The statute does not define "nondiscriminatory." *See* 52 U.S.C. § 20502. Nor do the regulations. *See* 11 C.F.R. § 9428.2. Likewise, the statute and regulations are silent on the proof necessary to make a successful discrimination claim under 52 U.S.C. § 20507(b)(1). Unlike, for example, Title VII, the NVRA does not expressly permit disparate-impact claims. *Compare* 42 U.S.C. § 2000e-2(k) (setting forth the burden of proof in disparate-impact cases), *with* 52 U.S.C. § 20507(b)(1) (requiring "nondiscriminatory" list-maintenance programs).

Albeit in dicta, the Supreme Court spoke into this statutory silence in 2018 and clarified that discriminatory intent—not mere disparate impact—would be required to assert a claim under 52 U.S.C. § 20507(b)(1). *See Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 779 (2018). In *Husted*, various interest groups alleged that Ohio's list-maintenance program violated the very next provision of the NVRA—52 U.S.C. § 20507(b)(2)'s failure-to-vote clause. In dissent, Justice Sotomayor pointed record evidence allegedly showing that Ohio's list-maintenance program had a disproportionate impact on "minority, low-income, disabled, and veteran voters." *Id*. at 808 (Sotomayor, J., dissenting). From this disparate-impact evidence, she would have found an NVRA violation because "[plaintiffs] need not demonstrate discriminatory intent." *Id*. Critically, however, the majority had no trouble rejecting this position. For one, they noted that the *Husted* plaintiffs did not assert a discrimination claim, and for another, they noted the absence of evidence "that Ohio instituted or has carried out its program with discriminatory intent," which would have been required for a successful discrimination claim. *Id*. at 779 (majority opinion).

16

*Husted* notwithstanding, Plaintiffs' uniform-and-nondiscriminatory claim rests wholly on allegations of disparate impact. Plaintiffs will undoubtedly point to several lower-court decisions recognizing disparate-impact claims under 52 U.S.C. § 20507(b)(1). *See, e.g.*, *Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025); *Va. Coal. for Immigrant Rights v. Beals*, 803 F. Supp. 3d 454 (E.D. Va. 2025); *United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012). But of course, those decisions must give way to the Supreme Court's reasoning in *Husted*. And moreover, those decisions trace the recognition of disparate-impact claims to *United States v. Florida*. *See Beals*, 803 F. Supp. 3d at 474 (refusing to dismiss a 52 U.S.C. § 20507(b)(1) claim because *Mi Familia Vota* and *Florida* both recognized disparate-impact claims); *Mi Familia Vota*, 129 F.4th at 714–15 (citing *Florida* and recognizing a disparate-impact claim). This 2012 decision pre-dated *Husted*, provided no statutory analysis of 52 U.S.C. § 20507(b)(1) showing that it authorizes disparate-impact claims, and ultimately denied temporary relief because Florida abandoned the list-maintenance program under review. *Florida*, 870 F. Supp. 2d at 1350. *Florida* cannot bear the weight placed upon it. The Court should be guided by *Husted*'s dicta, not *Florida*'s, and it should conclude that 52 U.S.C. § 20507(b)(1) does not permit Plaintiffs' disparate-impact claim.

Consequently, this Court can and should dismiss Count II.

**3.      Count III: Plaintiffs' due process claim is based on a misreading of the statute; it does not obviate the existing notice procedures.**

Procedural due process requires that a person receive notice and an opportunity to be heard when a property or liberty interest is in question. *Jahn v. Farnsworth*, 617 F. App'x 453, 459 (6th Cir. 2015). Courts consider three factors when analyzing a due process claim: (1) "the private interest affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards";

17

and (3) the government and public interests at stake. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, all three factors favor Defendant.

Begin with the private interest. Plaintiffs claim "a protected liberty interest in voting," Compl. ¶ 124, Dkt. 1 at PageID 26. They assert that S.B. 293 "deprives naturalized citizens of their liberty interest in remaining registered to vote without any pre-deprivation notice and an opportunity to be heard." Compl. ¶ 102, Dkt. 1 at PageID 22. At the outset, it is worth remembering that Plaintiffs are nonprofit organizations who cannot register to vote, and they have not identified any individual members with alleged injuries. This claim should be dismissed for this reason alone. *See supra* Section C (discussing associational standing).

But regardless, it is unclear whether the members of Plaintiffs' organizations enjoy a liberty interest in voter registration that is protected by procedural due process. In *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008), the Sixth Circuit held that allegations of voting machine failures impinging on "the fundamental right to vote" did "not implicate procedural due process." *Id.*, 548 F.3d at 479; *see also Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F. Supp. 3d 673, 688 (M.D. Tenn. 2020) (holding a plaintiff's right to vote is "not a cognizable liberty interest for purposes of procedural due process"); *Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 918 (E.D. Va. 2018) ("Plaintiffs here point to no authority actually supporting the existence of a procedural due process claim in this context of election irregularities."); *but see Teel v. Darnell*, No. 1:07-CV-271, 2008 U.S. Dist. LEXIS 13121, at *25 (E.D. Tenn. Feb. 20, 2008) ("Denial of the right to vote implicates a liberty interest."). At best, Plaintiffs offer only speculation about a potential liberty interest in voter registration affected by a misreading of Ohio's statutory and regulatory scheme. *See Lawson v. Shelby County*, 211 F.3d 331, 336 (6th Cir. 2000) ("The U.S. Constitution protects an individual's right to vote during an election, not the right to register to vote prior to an election.").

18

Next, the "erroneous deprivation" factor also favors the State. Plaintiffs allege S.B. 293 "authorizes" registration cancellation based on information obtained from "imperfect citizenship databases." Compl. ¶¶ 125–26, Dkt. 1 at PageID 26–27. Nowhere, however, do they allege that anyone's voter registration has been improperly cancelled based on stale information. At bottom, Plaintiff's procedural due process theory depends on the false assumption that S.B. 293 mandates cancellation of a voter's registration immediately, without notice, and based solely on a hit within one of the two databases. This theory glosses over all evidence to the contrary and assumes the worst. While Plaintiffs repeatedly allege that S.B. 293 mandates county boards of election cancel registrations "without providing any prior notice to the registered voter," *id.* at ¶ 82, they simultaneously concede that "the updated Ohio Election Manual (EOM) states that the Secretary of State will provide notice prior to removal from the voter rolls," *id.* at ¶ 85.

Plaintiffs handwave this official instruction away by claiming there is "no detail on how or when that notice would be provided and contradicts the statutory text" of S.B. 293. *Id.* But again, Plaintiffs are overreading the statute's silence on notice as a prohibition—all while ignoring the relevant notice-and-cure policy. The EOM offers multiple opportunities to cure before voting, or an individual can cast a provisional ballot and cure later. EOM at 4-146. And if an "elector's registration is canceled in error, it shall be restored and treated as though it were never canceled." Ohio Rev. Code § 3503.21(F)(2) (2026). As this Court stated in *League of Women Voters of Ohio v. LaRose*, 489 F. Supp. 3d 719 (S.D. Ohio 2020), "There is only an erroneous deprivation of the right to vote . . . if Plaintiffs do not receive notice and an opportunity to cure." *Id.* at 738. Neither of those deficiencies is present here.

Finally, the third *Mathews* factor cuts in Defendant's favor. Start with the State's interest in ensuring only citizens vote. There is "no question that combatting fraud and promoting confidence in elections is a substantial interest of the State." *League of Women Voters of Ohio*, 489 F. Supp. 3d,

19

at 737 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.")). Even assuming Plaintiffs have alleged a moderate burden on their voter-registration rights, Ohio's "important regulatory interests" in maintaining election integrity "are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). The State's interests in the integrity and orderly administration of elections outweigh Plaintiffs' alleged burden. *See League of Women Voters of Ohio*, 489 F. Supp. 3d at 737 (finding state's interest in orderly administration and integrity of elections outweighs burden imposed by three-day cure period for signature mismatch on absentee ballot application).

At the end of the day, S.B. 293 does not materially change the process for reviewing the statewide registration database vis-à-vis due process. It merely increases the frequency of the checks and codifies the use of the SAVE database. But monthly checks, as opposed to annual, do not negatively impact any of the *Mathews* factors. If anything, by conducting these checks more frequently, it will increase the accuracy of the checks. As for the addition of the SAVE database to § 3503.152, this merely codified its use; Defendant was already accessing it as part of a settlement agreement and utilizing it to check citizenship status. *See* EOM at 4-145–46. Finally, and most importantly, S.B. 293 does not, as Plaintiffs wrongly assume, remove the existing notice-and-cure process, which ensures individuals receive an opportunity to be heard before their registration is cancelled, as well as the ability to cast a provisional ballot before curing.

Accordingly, there is no due process violation, and this Court should dismiss Count III.

## CONCLUSION

Because Plaintiffs do not have standing, this Court lacks jurisdiction over this case. Alternatively, if this Court believes Plaintiffs have standing, it should dismiss the Complaint for failure to state a claim.

20

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Ann Yackshaw*

ANN YACKSHAW (0090623)*
*Counsel of Record*
JULIE M. PFEIFFER (0069792)
STEPHEN P. TABATOWSKI (0099175)
GREGORY A. RUSTICO (0104103)
TYLER W. BLAIR (0095595)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Ann.Yackshaw@OhioAGO.gov
Julie.Pfeiffer@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov
Gregory.Rustico@OhioAGO.gov
Tyler.Blair@OhioAGO.gov

*Counsel for Defendants*

21

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2026, the foregoing was filed with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties for whom counsel has entered an appearance. Parties may access this filing through the Court's system.

/s/ Ann Yackshaw
ANN YACKSHAW (0090623)
Assistant Attorney General