**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF OHIO; COUNCIL ON AMERICAN-ISLAMIC RELATIONS-NORTHERN OHIO, | Case No.: 2:26-CV-00177-MHW-SCS |
| Plaintiffs, | |
| v. | Judge Watson |
| | Magistrate Judge Shimeall |
| FRANK LAROSE, in his official capacity as the Ohio Secretary of State, | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 1

LEGAL STANDARD..................................................................................................... 3

ARGUMENT ................................................................................................................. 4

I.    Plaintiffs Have Plausibly Alleged Standing....................................................... 4

    A.    Plaintiffs plausibly allege organizational standing because SB 293 frustrates their core voter-registration activities and causes them to divert resources. .............. 4

    B.    Plaintiffs plausibly allege associational standing because SB 293 will disenfranchise their members and constituents, including naturalized citizens. ......... 9

II.    Plaintiffs Have Plausibly Alleged NVRA and Due Process Violations. .......................... 11

    A.    Plaintiffs plausibly allege that SB 293 violates Section 8(c) of the NVRA. ............. 11

    B.    Plaintiffs plausibly allege that SB 293 violates Section 8(b) of the NVRA. ............. 14

    C.    Plaintiffs plausibly allege that SB 293 violates the Due Process Clause. ................. 16

    D.    The Secretary's guidance cannot remedy SB 293's legal defects. ........................... 19

CONCLUSION................................................................................................................ 20

**INTRODUCTION**

Ohio Senate Bill 293 ("SB 293") alters Ohio voter list maintenance in five key respects. It expands database checks from the Ohio Bureau of Moter Vehicles ("BMV") to include the flawed federal Department of Homeland Security's Systematic Alien Verification for Entitlements ("SAVE") system; it increases the frequency of those checks from annual to at least monthly; it widens the pool of voters flagged for cancellation to *any* voter flagged as a noncitizen by the BMV or SAVE system, including those with outdated records that predate their naturalization and registration; it eliminates the 90-day pre-election prohibition on these checks; and it strips away critical notice protections, requiring election officials to initiate cancellations based solely on database matches. The extension of this systematic voter purge program into the 90-day "Quiet Period" before federal elections violates Section 8(c) of the National Voter Registration Act ("NVRA"), and the combination of these changes discriminates against naturalized citizens in violation of Section 8(b) of the NVRA. Additionally, the repeal of pre-removal notice and opportunity to cure violates the procedural due process rights of Plaintiffs' members and member-like constituents in violation of the Fourteenth Amendment.

These changes directly interfere with the core voter registration work of Plaintiffs League of Women Voters of Ohio ("League") and Council on American-Islamic Relations-Northern Ohio ("CAIR-N.O."), and they place the League's naturalized citizen members and CAIR-N.O.'s member-like constituents at substantial risk of erroneous removal. Plaintiffs therefore have standing to challenge SB 293 and plausibly allege that the challenged provisions are unlawful.

**BACKGROUND**

Ohio's list-maintenance regime is set forth in Ohio Rev. Code § 3503.152. Until recently, the statute's targeted regime required the Secretary to use the Ohio BMV database to conduct "an

1

annual review of the statewide voter registration database to identify persons who appear not to be United States citizens." Ohio Rev. Code § 3503.152 (2023).

Ohio permits certain lawfully present noncitizens to obtain driver licenses and State ID cards, which are valid for four or eight years and are not automatically updated to reflect a change in citizenship status. Compl. ¶ 42. Thus, the only registered voters flagged for notice and potential removal before SB 293 were those who, "in the following order": (1) "submit[ted] documentation" to the BMV indicating noncitizen status; (2) subsequently registered to vote; and (3) later "submit[ted] [noncitizen] documentation" to the BMV again. *See id.* at § 3503.152(A) (2023).

The statute also prohibited the Secretary from conducting these reviews "during the ninety days immediately preceding" a federal election. *Id*. § 3503.152(F) (2023). And it required that the Secretary send a written notice asking the voter to confirm citizenship; if there was no response within thirty days, a second notice was required; only if the voter failed to respond to the second notice within thirty days could the Secretary direct cancellation. *Id.* § 3503.152(B), (D) (2023).

SB 293 fundamentally alters that regime in five respects. ***First***, it increases the frequency of database checks from annual to "at least a monthly basis." Ohio Rev. Code § 3503.152(A) (2026). ***Second***, it expands the data sources for list maintenance. In addition to the BMV database, the Secretary must now consult the SAVE system. *Id.* § 3503.152(A). The SAVE system, however, was created in the 1980s to verify immigration status for public-benefit eligibility, not to determine voter eligibility. Compl. ¶ 51. In 2025, the federal government overhauled SAVE, *see id.* ¶ 54, but as agencies using SAVE have acknowledged, the system is "not always updated in a timely manner" and is "not a reliable indicator" of current citizenship status because it may not automatically update when an individual naturalizes. *See id.* ¶¶ 50–58.

***Third***, SB 293 expands the pool of voters subject to removal. Previously, only voters who

2

submitted noncitizen documentation to the BMV *after* registering to vote were flagged. Under SB 293, any voter who appears as a noncitizen in the BMV database or SAVE system will be flagged—even if they submitted noncitizen documentation well *before* registering, such as when obtaining a driver license prior to naturalization. *See id.* ¶¶ 45, 72. **Fourth**, SB 293 eliminates the prohibition on conducting these reviews within the ninety days preceding a federal election. *See generally* Ohio Rev. Code § 3503.152. **Fifth**, SB 293 removes the statute's notice protections. Rather than providing voters an opportunity to confirm their eligibility, the statute now requires the Secretary to transmit to county boards "a report of each person in the county who, *according to the databases* . . . is not a United States citizen" and directs that the boards "promptly [] cancel" those registrations. *Id.* § 3503.152(B)(1) (emphasis added); *see also id.* § 3503.21(A)(9). The statute thus requires the Secretary to transmit any report of a database match to the boards based solely on that information.

On January 15, 2026, the Secretary issued a Directive to county boards of elections implementing SB 293. *See* Ohio Sec'y of State, Directive 2026-02: Implementation of Substitute Senate Bill 293 ("Directive"), at 16 (Jan. 15, 2026), https://www.ohiosos.gov/assets/directive-2026-02-implementation-of-sb-293.pdf [https://perma.cc/AYE3-NTQ4]. The Directive provides that, following each monthly citizenship review, the Secretary will send "a report to each board of elections listing those [flagged] individuals so the board can take the appropriate action," and it instructs boards to follow the Ohio Election Official Manual ("EOM") when processing removals. *Id.* (citing Ohio Election Official Manual, Chapter 4: Voter Registration, https://www.ohiosos.gov/assets/2026-02_fulleom.pdf) [https://perma.cc/GH5C-2ADU].

## LEGAL STANDARD

The Secretary challenges Plaintiffs' standing under Federal Rule of Civil Procedure

3

12(b)(1) and the viability of their claims under Rule 12(b)(6). Because the Secretary raises a facial attack on standing, this Court must "take[] the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). The Court must therefore "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (citation modified). A motion to dismiss must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts . . . which would entitle him to relief." *Id.*

## ARGUMENT

### I. Plaintiffs Have Plausibly Alleged Standing.

At the pleading stage, a plaintiff must plausibly allege: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *U.S. Food & Drug Admin. v. All. for Hippocratic Med.* ("*AHM*"), 602 U.S. 367, 381 (2024). Organizational plaintiffs may satisfy these requirements by alleging their own injuries (organizational standing) or those of their members (associational standing). *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA*"), 600 U.S. 181, 199 (2023). Plaintiffs plausibly allege standing on both theories.

   A. Plaintiffs plausibly allege organizational standing because SB 293 frustrates their core voter-registration activities, which also causes them to divert resources.

An organizational plaintiff has Article III standing if it "suffered an injury in its own right." *SFFA*, 600 U.S. at 199; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 365 (1982). Plaintiffs plausibly allege SB 293 imposes concrete harm to the organizations themselves.

4

The Secretary wrongly asserts that the Supreme Court "greatly constrained" organizational standing in *AHM*. MTD Br. 8. In fact, *AHM* reaffirmed *Havens*' core holding: An organization suffers a cognizable injury when a challenged action "directly affect[s] and interfere[s] with [its] core business activities." *AHM*, 602 U.S. at 395 (citing *Havens*). What *AHM* clarified, however, is that an organization "cannot 'spend [its] way into standing' by voluntarily using resources to *counter*" the challenged action. *Tenn. Conf. of NAACP v. Lee*, 139 F.4th 557, 565 (6th Cir. 2025) (quoting *AHM*, 602 U.S. at 394).

In *Havens*, the plaintiff, HOME, alleged that "its efforts to assist equal access to housing through counseling and other referral services" were frustrated because it "had to devote significant resources to identify and counteract" the defendant's discriminatory practices. 455 U.S. at 379; *see AHM*, 602 U.S. at 395 (finding it "[c]ritical[]" that "HOME not only was an issue-advocacy organization but also operated a housing counseling service"). Because the challenged conduct "perceptibly impaired HOME's ability to provide" its services, the organization "suffered injury in fact"—a "concrete and demonstrable injury to [its] activities" with a "consequent drain on [its] resources." *Havens*, 455 U.S. at 379. In other words, the defendant's actions "directly affected and interfered with HOME's core business activities." *AHM*, 602 U.S. at 395.

Applying that standard, the *AHM* Court found plaintiffs lacked standing when they only expended resources on "public advocacy and . . . education" to "oppose [the defendant's] actions[,]" instead of showing that the defendant's actions impeded their core activities. 602 U.S. at 394–95. The Court held that an organization that has not *otherwise* suffered a concrete injury "cannot spend its way into standing simply by expending money to gather information and advocate against" the action, but it did not disturb *Havens*' rule that standing exists when a policy impairs a plaintiff's core activities or forces a diversion of resources from those activities. *Id.*

5

Unlike in *AHM*, Plaintiffs here allege direct interference with their core activities: registering and assisting voters. Plaintiffs thus fall squarely within the ambit of *Havens*.

The League is the Ohio affiliate of the League of Women Voters, and its core activities include voter registration and engagement, to which it dedicates a major portion of its resources. Compl. ¶¶ 12, 15. The League "conducts voter registration at naturalization ceremonies and at festivals celebrating various cultures and nationalities." *Id.* ¶ 15. CAIR-N.O. is a chapter of the national Council on American-Islamic Relations whose core activities also include "protecting the rights of eligible voters to register to vote and to vote in Ohio," and it dedicates a major portion of its resources to voter engagement, including registering naturalized citizens. *Id.* ¶¶ 23, 24–25, 27.

The Complaint plausibly alleges that SB 293 directly impairs Plaintiffs' core activity of registering voters and assisting them in navigating the voting process. SB 293 mandates monthly systematic audits and voter purges, *see* Compl. ¶¶ 69–89, including "up to and during the period when voter registration in Ohio is about to close or has closed," which will leave erroneously removed voters potentially with "no opportunity" for pre-election correction, Compl. ¶ 17. These individuals—including those the League and CAIR-N.O. registered—will very likely be unable to vote, undermining the efficacy of the organizations' core activities.

The Complaint further alleges that this impairment will force Plaintiffs to divert resources to mitigate the law's effects. *Id.* ¶¶ 14, 26. To continue registering voters, particularly naturalized citizens, Plaintiffs must redirect resources from other core activities to help voters avoid erroneous removal and, if removed, assist them in re-registering in time to vote, Compl. ¶¶ 16, 25–26, train volunteers and interns on identifying and addressing wrongful removals, and prepare additional voter information materials in multiple languages. *Id.* ¶¶ 18, 22, 29. These efforts detract from the League's ordinary voter engagement, including programs for youth, military, and unhoused voters;

6

poll worker recruitment; and election protection, *id.* ¶ 20–21. They limit CAIR-N.O.'s ability to address other priorities, such as assisting individuals who have suffered civil rights violations. *Id.* ¶¶ 28, 30. Because the challenged provisions "have perceptibly impaired [Plaintiffs'] ability to provide" voter registration assistance, they have concretely and demonstrably injured Plaintiffs beyond a mere "setback to the organization's abstract social interests[,]" leaving "no question that [Plaintiffs] ha[ve] suffered injury in fact." *Havens*, 455 U.S. at 379.

Indeed, numerous courts have held that organizations providing voter-registration services have standing to challenge similar purge regimes that impair their core activities and force resource diversion. *See Common Cause Ind. v. Lawson*, 937 F.3d 944, 952 (7th Cir. 2019) (organization had standing to challenge purge provision that required it "to increase the time or funds (or both) spent . . . to alleviate . . . voter confusion, erroneous registration removal, and chaos at the polling place," harming its mission by displacing other projects); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (similar); *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 986–87 (D. Ariz. 2024), *aff'd in part, vacated in part on other grounds*, 129 F.4th 691 (9th Cir. 2025) (similar). Post-*AHM*, courts continue to recognize standing where election laws impair an organization's core voter-engagement activities. *E.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 57–60 (D.D.C. 2025); *N.H. Youth Movement v. Scanlan*, No. 24-cv-291, 2025 WL 2336868 (D.N.H. Aug. 13, 2025); *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 707 n.3 (N.D. Ohio 2024); *Caicedo v. DeSantis*, No. 23-CV-2303, 2024 WL 4729160, at *5 (M.D. Fla. Nov. 8, 2024); *Get Loud Ark. v. Thurston*, No. 24-CV-5121, 2024 WL 4142754, at *14 (W.D. Ark. Sep. 9, 2024); *see also Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 397 (4th Cir. 2024).

The Secretary's remaining arguments lack merit. First, he contends that Plaintiffs' resource

diversion is too "minimal" to support standing. MTD Br. 9–10. But where a challenged action impairs an organization's core activities, the organization suffers a cognizable injury regardless of the magnitude of any resulting resource diversion because diversion is "merely a symptom of that programmatic injury." *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see also AHM*, 602 U.S. at 395. And even a minimal diversion would suffice, as Article III requires only an "identifiable trifle" of an injury, *United States v. SCRAP*, 412 U.S. 669, 689 n.14 (1973); *see also Norton v. Beasley*, No. 21-6053, 2022 WL 17348385, at *7 (6th Cir. Dec. 1, 2022). Plaintiffs allege more: The diversion will "strain" their core activities. Compl. ¶¶ 17–18, 29.

Furthermore, the Secretary's assertion that Plaintiffs' injuries are speculative conflates pleading and proving standing. MTD Br. 10–11. The Secretary faults Plaintiffs for "offer[ing] no *examples or evidence*" that they will encounter erroneously removed eligible voters. *Id.* at 10 (emphasis added). That is not the standard on a motion to dismiss, where Plaintiffs need only allege facts showing "a plausible entitlement to standing." *Hile v. Michigan*, 86 F.4th 269, 274 (6th Cir. 2023). Plaintiffs need not *prove* that they will encounter improperly removed voters until after discovery on summary judgment. The Secretary's reliance on *Tenn. Conf. of the NAACP*, 139 F.4th 557, is therefore misplaced—that case addressed proof of standing at summary judgment, not the sufficiency of allegations at the pleading stage. *Id.* at 559, 566*; see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (the nature and degree of evidence required to prove standing vary based on "the successive stages of the litigation").

The Secretary argues that Plaintiffs cannot trace their injuries to SB 293 because their expenditures are voluntary. MTD Br. 11. But expenditures undertaken to counteract a policy's interference with core activities are not self-inflicted; they are a foreseeable consequence of the injury. *AHM*, 602 U.S. at 394. Here, Plaintiffs allege that SB 293 directly impairs their voter-

registration work, and their responsive expenditures flow from that impairment.

Finally, the Secretary suggests Plaintiffs lack standing because voter-registration organizations may not "fall within the zone of interest protected by the NVRA." MTD Br. 11 (internal quotation marks omitted). Yet courts addressing this have held that voter-registration organizations may sue under the NVRA. *See, e.g.*, *ACORN v. Fowler*, 178 F.3d 350, 363–65 (5th Cir. 1999); *Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1268 (D. Colo. 2010). And Plaintiffs have standing so long as they are "*arguably*" within "the class of plaintiffs whom Congress has authorized to sue under [the NVRA]." *See Lexmark Intern. Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014) (emphasis added); *accord Tenn. Conf. of the NAACP*, 139 F.4th at 569.

B.   <u>Plaintiffs plausibly allege associational standing because SB 293 will disenfranchise their members and constituents, including naturalized citizens.</u>

Plaintiffs also allege standing to sue on behalf of their members and member-like constituents because (1) the individuals "'would otherwise have standing to sue in their own right'; (2) the 'interests'" the suit "'seeks to protect are germane to the organization's purpose'"; and (3) individual participation is not required. *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin. ("AAPS")*, 13 F.4th 531, 537 (6th Cir. 2021) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977)). Contesting only the first element, the Secretary argues that Plaintiffs did not identify "a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct." MTD Br. 6–7 (quoting *AAPS*, 13 F.4th at 543). The Secretary is wrong on the facts and the law.

The Complaint adequately alleges that the League's and CAIR-N.O.'s naturalized citizen members and member-like constituents have standing because they "are especially vulnerable to being improperly flagged and removed under SB 293's systemic purges," Compl. ¶¶ 13, 18, 26,

9

31; *see also id.* ¶¶ 35–58 (similar regimes have erroneously flagged naturalized citizens as noncitizens). Courts routinely find standing under these facts. *See Arcia*, 772 F.3d at 1341 (naturalized citizens "sufficiently established standing based on" errors databases may produce in checking immigration status in the 90 days before an election); *Mi Familia Vota*, 719 F. Supp. 3d at 986–87 (similar).

The Secretary argues that Plaintiffs nevertheless lack standing because they rely on speculative injuries to "unknown member[s]." MTD Br. 7 (quoting *AAPS*, 13 F.4th at 543). But at the pleading stage, a plaintiff need not *name* but must only *identify—i.e.*, describe and plausibly allege the existence of—a member with standing. *See AAPS*, 13 F.4th at 544; *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 23-cv-1595, 2024 WL 3992579, at *4 (S.D. Ohio Aug. 28, 2024) (plaintiff not required to "name . . . members at the pleading stage"); *accord Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012); *Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144–45 (2d Cir. 2006); *Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Ga.*, 833 F. App'x 235, 240 n.8 (11th Cir. 2020).

In any event, the League identifies and names a naturalized citizen member, Jona Hilario, who is among the many naturalized Ohioans still listed as noncitizens in BMV records. Compl. ¶¶ 13, 41, 46. This misidentification resulted in her being improperly flagged during the Secretary's 2024 election audit targeting suspected noncitizens. *Id.* ¶ 13. Under SB 293's monthly BMV checks, Ms. Hilario is substantially likely to be flagged again. *See Tenn. Conf. of the NAACP*, 139 F.4th at 567 (exposure to past harm may "help show imminent future harm"). The Secretary speculates Ms. Hilario's voter registration was "presumably corrected" and her citizenship records "already . . . updated." MTD Br. 7–8. But on a motion to dismiss, the Court cannot simply presume,

10

contra the Complaint, that BMV records now accurately reflect her citizenship. *See* Compl. ¶ 41. And even if local election officials have information to the contrary, SB 293 mandates removing any registered voter whom the BMV database or SAVE system identifies as a noncitizen. Ohio Rev. Code § 3503.152(B)(1). Similarly, CAIR-N.O. identifies three staff members and five board members who are naturalized citizen registered voters, and, like Ms. Hilario, are substantially likely to be erroneously flagged as noncitizens under SB 293. *See* Compl. ¶ 31.

## II.      Plaintiffs Have Plausibly Alleged NVRA and Due Process Violations.

### A.   Plaintiffs plausibly allege that SB 293 violates Section 8(c) of the NVRA.

Section 8(c) of the NVRA requires states to complete "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" no later than 90 days before a federal election (hereinafter "Quiet Period"). 52 U.S.C. § 20507(c)(2)(A). A program is systematic if it uses a "mass computerized data-matching process" to identify and confirm names for removal without "individualized information or investigation." *Arcia*, 772 F.3d at 1344. Congress prohibits such programs during the Quiet Period not to protect those who are ineligible to vote but because they are inherently error-prone and risk disenfranchising eligible voters. *See id.* at 772 F.3d at 1346. Section 8(c) does not forbid individualized removals during the Quiet Period or removals based on (1) registrant requests, (2) criminal conviction, (3) mental incapacity or death, or (4) for correction of registration records. *See* 52 U.S.C. § 20507(c)(2)(B).

SB 293 violates Section 8(c) because it mandates that the Secretary undertake a systematic program to remove voters from Ohio's rolls during the Quiet Period based on purported noncitizen status, which is not one of the statute's designated exceptions. *See* Compl. ¶¶ 91–98. By its plain text, SB 293 requires the Secretary to initiate cancellation procedures whenever the BMV database

11

or SAVE system indicates that a registrant is not a citizen. Ohio Rev. Code § 3503.152(B)(2). The statute does not contemplate discretion to conduct individualized inquiries into citizenship status, much less to withhold reports to boards of elections based on the results of such inquiries. Instead, a database match triggers mandatory removal. The Secretary's reliance on pre-SB 293 contrary guidance to characterize the program as "individualized," *see* MTD Br. 13–14, cannot overcome the statute's text or the well-pleaded allegations in the Complaint, which this Court must accept as true. *See infra* Argument § II.D.

Indeed, every court to consider voter-purge programs similar to SB 293's has held that they are systematic. In *Arcia*, Florida relied on database matching, including a SAVE system check, to identify voters for potential removal, and the Eleventh Circuit held that such a program is "'systematic' . . . under any meaning of the word." 772 F.3d at 1344. Likewise, the Ninth Circuit has recognized that "'us[ing] a mass computerized data-matching process to compare the voter rolls with other State and federal databases'" is systematic. *See Mi Familia Vota*, 129 F. 4th at 716 (quoting *Arcia*, 772 F. 3d at 1344); *see also Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348, 1355 (M.D. Ga. 2020); *N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 16-cv -1274, 2016 WL 6581284, at *6–7 (M.D.N.C. Nov. 4, 2016). SB 293 operates in precisely the same way: It directs the Secretary to compare the voter roll against State and federal databases rather than relying upon "individualized information or investigation." *Arcia*, 772 F. 3d at 1344.

Next, the Secretary argues that, even if SB 293 is systematic, it still does not violate Section 8(c) because states may conduct systematic removal programs during the Quiet Period if they are based on suspected noncitizen status. MTD. Br. 14. That is incorrect. Section 8(c) prohibits "*any program* the purpose of which is to systematically remove the names of ineligible voters" within

12

the Quiet Period, 52 U.S.C. § 20507(c)(2)(A) (emphasis added)—a deliberately broad formulation reflecting Congress' concern that such programs are especially prone to erroneous disenfranchisement. *Arcia*, 772 F.3d at 1343 (holding that "any program" included a "program like [defendant's] to remove noncitizens" based on the plain meaning of "any"); *see also Mi Familia Vota*, 129 F.4th at 715 (citing dictionary definition of "any"). While Section 8(c) enumerates some limited exceptions, alleged noncitizen status is not one of them. *See Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied.").

The Secretary's position, by contrast, relies on an atextual reading of Section 8(c) that distorts Congress's intent. He contends that, because noncitizens are not "eligible applicants" under Section 8(a), they never become "ineligible voters" under Section 8(c)—and thus, in his view, are not protected from systematic removal during the Quiet Period. MTD Br. 14. These statutory gymnastics attempt to complicate a simple legislative command. The Secretary's interpretation of "ineligible voter" conflicts with its ordinary meaning, *see Sebelius v. Cloer*, 569 U.S. 369, 376 (2013), because noncitizens are ineligible to vote, *see* 18 U.S.C. § 611; Ohio Rev. Code § 3599.12. Ordinary usage confirms this: an "ineligible voter" is simply a person who votes or is listed as a voter but is not legally qualified. Thus, as numerous courts have held, noncitizens are "ineligible voters," and systematic removal programs based on suspected non-citizenship are prohibited during the Quiet Period to prevent erroneously disenfranchising eligible citizen voters. *See Arcia*, 772 F.3d at 1346–47; *Mi Familia Vota*, 129 F.4th at 715–17.

The Secretary is also incorrect that SB 293 comports with the purpose of the NVRA. MTD Br. 14. To the contrary, SB 293 will result in eligible voters being mistakenly purged in the weeks before an election and therefore flouts the NVRA's purpose of ensuring that eligible voters remain

13

on the rolls. *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018) (the NVRA has "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls").

*Bell v. Marinko,* 367 F. 3d 588 (6th Cir. 2004), is not to the contrary because it addressed routine list maintenance *outside* the Quiet Period under Section 8(a) of the NVRA. MTD Br. 14. There, the plaintiffs were removed from the voter rolls because the state determined they were not residents of the relevant election precinct. *Bell*, 367 F.3d at 589. The Sixth Circuit simply held that Section 8(a) does not "bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place." *Id.* at 591–92. That ruling provides no support for permitting (error-prone) systematic removals during the Quiet Period.

B.   Plaintiffs plausibly allege that SB 293 violates Section 8(b) of the NVRA.

Section 8(b) of the NVRA requires that voter list maintenance programs be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). This protects against list maintenance programs that are not uniformly applied or that discriminate against, among others, naturalized citizens. *See Mi Familia Vota*, 129 F.4th at 714–15. Plaintiffs plausibly allege that SB 293 will result in the disproportionate removal of eligible naturalized citizens in a nonuniform and discriminatory manner, in violation of Section 8(b). The statute's intentional use of outdated citizenship records heightens this risk, exposing naturalized citizens—who are more likely to be misidentified in such records—to unlawful removal.

Courts have found Section 8(b) violations where states have used stale driver license data to identify purported noncitizens. In *United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012), Florida attempted a similar program, but because licenses were only renewed every six years, "many properly registered" naturalized citizens were improperly flagged as noncitizens. *Id.*

14

at 1347–48, 1350. Because the system would "primarily [flag] newly naturalized citizens," the court found it would likely "have a discriminatory impact on these new citizens" in violation of Section 8(b). *Id.* at 1347, 1350. Here, Plaintiffs allege that SB 293 will predictably and disproportionately (indeed, systematically) burden or target protected classes of eligible voters, including naturalized citizens, in violation of Section 8(b). Compl. ¶¶ 115–20. SB 293's removal program relies on stale data because it flags any voter who appears as a noncitizen in the BMV database—even if they submitted noncitizen documentation *before* registering, such as those who obtained driver licenses prior to naturalization. *See id*. ¶¶ 45, 72. Like in *Florida*, these records will often reflect outdated citizenship status for the tens of thousands of Ohioans who naturalize every year but have not yet updated their driver license. *See id.* ¶¶ 3, 38–44. SB 293 will therefore disproportionately identify and remove naturalized citizens. *Id.* ¶ 118.

Courts have also found that removal programs that rely on SAVE likely violate Section 8(b) as applied to naturalized citizens. In *Mi Familia Vota*, the Ninth Circuit struck down an Arizona law that required county election officials to check the SAVE system's records for individuals they had "reason to believe" were not citizens. 129 F.4th at 714–15. Similarly, because SAVE's social security data only reflects a person's "citizenship status when they applied for a social security number[,]" SAVE system matching will disproportionately affect naturalized citizens, Compl. ¶¶ 56, 77; *see also id.* ¶¶ 100, 117, thereby violating Section 8(b) by causing "a discriminatory impact on [naturalized] citizens." *Mi Familia Vota*, 129 F.4th at 714 (quoting *Florida*, 870 F. Supp. 2d at 1350).

The Secretary does not dispute that SB 293 will have a discriminatory effect on naturalized citizens—nor could he on a motion to dismiss—but instead contends that Section 8(b) claims require proof of discriminatory intent. MTD Br. 16. His only support for this proposition is a

15

sentence of dicta from *Husted v. A. Phillip Randolph Inst.*, 584 U.S. 756 (2018). But *Husted* did not involve a Section 8(b) claim and did not abrogate Section 8(b) caselaw holding otherwise.

Indeed, pre- and post-*Husted*, courts routinely allow Section 8(b) claims without requiring proof of intent. *See, e.g.*, *Tenn. Conf. of the NAACP v. Lee*, 730 F. Supp. 3d 705, 738 (M.D. Tenn. 2024) (finding a Section 8(b) violation without intent where "unjustified burdens and barriers to registration" existed for "a [specific] class of applicants—those with prior felony convictions"), *stay granted on other grounds*, 105 F.4th 888 (6th Cir. 2024), *and rev'd on other grounds*, 139 F.4th 557 (6th Cir. 2025); *Mi Familia Vota*, 129 F.4th at 714 (finding citizenship checks at issue "non-uniform" and "discriminatory *in effect*") (emphasis added); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703–04 (N.D. Ohio 2006) (finding a Section 8(b) violation for disproportionate burdens on elderly and poor registration workers); *Florida*, 870 F. Supp. 2d at 1350.

C.   Plaintiffs plausibly allege that SB 293 violates the Due Process Clause.

The Fourteenth Amendment's Due Process Clause guarantees meaningful notice and an opportunity to be heard before the deprivation of a protected liberty interest. *Hieber v. Oakland Cnty.*, 136 F.4th 308, 320–21 (6th Cir. 2024) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)). Under *Mathews v. Eldridge*, 424 U.S. 319 (1976), courts evaluate the process required by balancing three factors: (1) "the private interest" at play; (2) the risk of "erroneous deprivation" of this interest under the procedures used and the "probable value" of "additional procedural safeguards"; and (3) "the [g]overnment's interest." *Id.* at 335. Here, all three factors weigh decisively in Plaintiffs' favor.

First, Plaintiffs' naturalized citizen members and member-like constituents have a fundamental "right to vote," which "implicates a liberty interest protected by the Due Process Clause." *Miller v. Blackwell*, 348 F. Supp. 2d 916, 921 (S.D. Ohio 2004). Therefore, they "cannot

16

be disenfranchised without notice and an opportunity to be heard." *Bell v. Marinko*, 235 F. Supp. 2d 772, 777 (N.D. Ohio 2002) (collecting cases). The Secretary's response—that Plaintiffs "have not identified any individual members with alleged injuries," MTD Br. 18—is incorrect. *See supra* Argument § I.B (specific members at risk of erroneous removal).

The cases cited by the Secretary, MTD Br. 18, are not to the contrary. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008), and the cited district court cases hold only that election administration mistakes do not necessarily give rise to a procedural due process claim. *Id.* at 479. *Lawson v. Shelby County*, 211 F.3d 331, 336 (6th Cir. 2000), is even further afield, holding that wrongfully removed voters' claims accrue when they are "turned away from the polls on election day." None disclaims the fundamental liberty interest in voting.

Second, the risk of "erroneous deprivation" and "probable value" of "additional or substitute procedural safeguards" weigh strongly in Plaintiffs' favor. *Mathews*, 424 U.S. at 335. SB 293 has no provision for notifying mistakenly flagged eligible voters. Instead, it removed statutory language providing such notice. *See* Ohio Rev. Code § 3503.152(B), (D) (2023).

The Secretary's efforts to downplay the risk of erroneous deprivation are unavailing. *See* MTD Br. 19. He argues that the EOM provides voters an opportunity to contest their removal before it occurs, but that contention is inconsistent with the text of SB 293. *See infra* Argument § II.D. He also asserts that voters may contest their removal after the fact, MTD Br. 19 (citing Ohio Rev. Code § 3503.21(F)(2)), but the statute provides no meaningful guidance on how a voter would do so, and the EOM's attempt to fill that gap creates a deeply inadequate process. *See infra* Argument II.D. The Secretary also contends that, even if voters cannot restore their registration before the election, they may cast a provisional ballot. MTD Br. 19. But such ballots will not be counted unless the voter submits documentary proof of citizenship ("DPOC") within four days of

17

the election. Ohio Rev. Code § 3505.183(B)(1)(i). That, too, is inadequate: Many voters lack ready access to DPOC, particularly within such a compressed timeframe. *Cf. Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020) (DPOC requirement imposed an undue burden on the right to vote); *Newby*, 838 F.3d at 12 (DPOC requirement posed "a substantial risk that citizens will be disenfranchised").

The Secretary's contention that the increased frequency of citizenship checks under SB 293 does "not negatively impact any of the *Mathews* factors[,]" MTD Br. 20, is incorrect. Prior to SB 293, Ohio law prohibited database checks in the critical "ninety days immediately preceding a primary or general election for federal office." *See* Ohio Rev. Code § 3503.152(F) (2023). Because "[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote[,]" *Arcia*, 772 F.3d at 1346, this is a shift not only in degree but also in kind, implicating due process. The Secretary's unsupported hypothesis that more database checks will "increase the[ir] accuracy," MTD Br. 20, cannot be credited on a motion to dismiss. SB 293's citizenship checks trigger removals based on stale data with no mechanism for restoring mistaken removals, so more frequent checks will only lead to more erroneous removals.

Finally, consideration of the relevant government interest favors Plaintiffs. The Secretary attempts to frame the government interest as "the integrity and orderly administration of elections" and "combatting fraud and promoting confidence in elections." *Id.* at 19, 20 (quoting *League of Women Voters of Ohio v. LaRose*, 489 F. Supp. 3d 719, 737 (S.D. Ohio 2020)). But for due process purposes, the consideration at issue is not the State's ability to maintain its voter registration list, but rather the State's interest in removing voters from the list *without notice or opportunity to be heard*. Compl. ¶¶ 125–26. Removing these notice protections does not combat fraud; it increases the risk of erroneous removals and, in turn, undermines public confidence in elections. In any event, this sort of evidentiary weighing the Secretary urges is improper at the pleading stage.

18

D.    The Secretary's guidance cannot remedy SB 293's legal defects.

The Secretary does not meaningfully contend that SB 293, as written, complies with the NVRA or the Due Process Clause. Instead, he argues that his Directive and the EOM somehow cure the statute's legal defects. They do not.

First, the Secretary asserts that SB 293 does not violate Section 8(c) because "the EOM demonstrates that Defendant has employed this discretion to conduct individualized inquiries, and his recent directive confirms that he will continue to do so." MTD Br. 14. But the EOM predates SB 293 and, as discussed above, SB 293 itself does not appear to contemplate any such discretion. *See supra* Argument § II.A. And the Directive, which post-dates SB 293, does not actually purport to introduce individualized review. It provides only that, after running BMV and SAVE checks, the Secretary "sends a report to each board of elections listing those individuals so the board can take the appropriate action." Directive at 16. That instruction merely implements the statute's mandatory, match-based cancellation scheme—it does not soften it.

Regardless, the Secretary may not exercise discretion that the statute withholds. The EOM purports to authorize individualized review by giving flagged voters an opportunity to prove their citizenship. But the cited EOM provisions reflect the prior statutory regime—protections SB 293 has eliminated. *See Monsalvo Velazquez v. Bondi*, 604 U.S. 712, 728 (2025) ("[O]f course" a regulation cannot "trump a statute."); *State ex rel. Am. Legion Post 25 v. Ohio Civ. Rts. Comm'n*, 884 N.E.2d 589, 593 (Ohio 2008) (same); *Libertarian Party of Ohio v. Brunner*, 567 F. Supp. 2d 1006, 1012 (S.D. Ohio 2008) (same). Even if the EOM's notice provisions could somehow be implemented consistently with SB 293—a showing the Secretary does not attempt—they cannot justify dismissal at the pleading stage, where the Court must draw all inferences about SB 293's implementation in Plaintiffs' favor. That is particularly true because the EOM reflects only the

19

Secretary's current enforcement intentions, which he may change at any time. *See* EOM at 1-1–1-2 ("[T]he EOM is updated regularly."). Viable claims challenging unlawful statutes are not defeated by assurances about how they will be enforced. *See United States v. Stevens*, 559 U.S. 460, 480 (2010); *Carey v. Wis. Elections Comm'n*, 624 F. Supp. 3d 1020, 1030 (W.D. Wis. 2022).

Second, the Secretary argues that the Court should dismiss Plaintiffs' Due Process claim because the EOM is "evidence" of additional process. MTD Br. 19 ("The EOM offers multiple opportunities to cure before voting, or an individual can cast a provisional ballot and cure later."). As discussed, SB 293 mandates cancellation based on database matches without adequate notice or opportunity to be heard. The Secretary's litigation position that the State will nonetheless continue to follow the pre-SB 293 guidance cannot override the statute's text, particularly at the motion to dismiss stage. In any event, while the EOM provides that removed voters may "request a hearing and administrative appeal," their registration will not be restored unless they "provide proof of citizenship at the hearing." EOM at 4-146. That process is deeply inadequate. SB 293 will remove eligible voters in the "days or weeks before Election Day," leaving them unlikely to "be able to correct the State's errors in time to vote." *Arcia*, 772 F.3d at 1346. Moreover, many voters lack ready access to DPOC. *See supra* Argument § II.C.

## CONCLUSION

For these reasons, the Secretary's motion to dismiss should be denied.

Dated: April 9, 2026

Respectfully submitted,

/s/ *Freda J. Levenson*

| | |
|---|---|
| Freda J. Levenson (0045916) | David J. Carey (0088787) |
| (*Trial Attorney*) | Carlen Zhang-D'Souza (0093079) |
| Amy Gilbert (0100887) | ACLU OF OHIO FOUNDATION, INC. |
| ACLU OF OHIO FOUNDATION, INC. | 1108 City Park Avenue, Suite 203 |
| 4506 Chester Avenue | Columbus, Ohio 43206 |

Cleveland, Ohio 44103
(216) 541-1376
flevenson@acluohio.org
agilbert@acluohio.org

Davin Rosborough*
Ethan Herenstein*
Nina Nayiri McKay*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
eherenstein@aclu.org
nmckay@aclu.org
slakin@aclu.org

Patricia J. Yan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20001
(202) 457-0800
pyan@aclu.org

(380) 215-1972
dcarey@acluohio.org
czhangdsouza@acluohio.org

Anna Baldwin*
Sejal Jhaveri (NY Bar. # 5396304)
Kate Hamilton*
Kate Uyeda*
Brendan Nigro*
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
abaldwin@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
kuyeda@campaignlegalcenter.org
bnigro@campaignlegalcenter.org

*Admitted *pro hac vice*

*Counsel for Plaintiffs*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Freda J. Levenson*_____
Freda J. Levenson (0045916)
(*Trial Attorney*)

22