**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF OHIO, and COUNCIL ON AMERICAN-ISLAMIC RELATIONS – NORTHERN OHIO, | : : : : | |
| | : | **Case No. 2:26-cv-177** |
| Plaintiffs, | : | |
| | : | **Judge Michael H. Watson** |
| v. | : | |
| | : | **Mag. Judge S. Courter M. Shimeall** |
| | : | |
| | : | |
| FRANK LAROSE, in his official capacity as Ohio Secretary of State, | : : | |
| | : | |
| | : | |
| Defendant. | : | |

---

**DEFENDANT'S REPLY IN FURTHER SUPPORT OF HIS MOTION TO DISMISS**

---

**INTRODUCTION**

Plaintiffs want to litigate this case in a reality of their own making.  While hiding behind a lax interpretation of federal pleading standards, they concoct a version of events that is belied by precedent, statute, and observable facts.  But just as a plaintiff cannot spend its way into standing, it likewise cannot fictionalize its way into a cognizable claim that survives Rule 12.

Plaintiffs' response ignores reality in three key respects.  First, Plaintiffs either handwave or ignore current standing case law.  In essence, they ask this Court to time travel back to the days before *Alliance for Hippocratic Medicine*, *Tennessee Conference of the NAACP*, and *Association of Physicians and Surgeons*.  But organizational and associational standing have been circumscribed in recent years, and this Court should not ignore those developments.  Under current case law,

1

Plaintiffs lack either organizational or associational standing because they have failed to plead direct interference with their core business or to identify a member with standing.

Second, Plaintiffs construct a straw-man version of S.B. 293.  Rather than showing that S.B. 293 makes compliance with federal law impossible or obstructs congressional objectives, Plaintiffs rely on an exaggerated, worst-case-scenario reading of S.B. 293.  But case law instructs this Court to do the opposite: it must interpret federal and state laws not to conflict whenever possible.  When the Court does so, it will see that S.B. 293 does not do what Plaintiffs claim it does.

Third and finally, Plaintiffs ask this Court to accept probabilities and speculation as sufficient to state a claim.  They ignore published regulations and directives about how these voter roll checks are conducted.  Plaintiffs ask this Court to close its eyes to these verifiable sources that contradict their narrative.  Yet contrary to their imagined scenario, Ohio does not immediately remove voter registrations without notice.  This Court need not indulge Plaintiffs' alarmist version of events when statutory and regulatory language shows otherwise.

Ultimately, this Court should reject Plaintiffs' invitation to enter their fictional world.  Instead, it should evaluate the defects in Plaintiffs' Complaint against the case law, statutes, and regulations as they actually exist—not as Plaintiffs wish them to be.  If it resists Plaintiffs' lure, this Court will find Plaintiffs lack standing and have failed to state a valid claim for relief.

A.   **Plaintiffs' theory of organizational standing is anachronistic and conflicts with current case law, most notably *Tennessee Conference of the NAACP*.**

If you were to read Plaintiff's Opposition in a vacuum, you would think that organizational standing is alive and well.  By their reading, the Supreme Court's decision in *Alliance for Hippocratic Medicine* "reaffirmed *Havens'* core holding."  Pls.' Opp'n at 5, Dkt. 21 at PageID 200.  But one man's "reaffirmation of a core holding" is another man's "cabining to its facts."  *See* Lee Epstein et al., *The Decision to Depart (or not) from Constitutional Precedent: An Empirical Study*

2

*of the Roberts Court*, 90 N.Y.U. L. Rev. 1115, 1126 (2015) ("The Justices have many techniques for undermining the vitality of their precedents: overruling them *sub silentio*, as well as limiting, questioning, criticizing, or distinguishing previous decisions.").

Thankfully, in *Tennessee Conference of the NAACP v. Lee*, 139 F.4th 557 (6th Cir. 2025), the Sixth Circuit discussed the effect of *Alliance for Hippocratic Medicine* on *Havens* in detail, *id.* at 562–65. While the court identified some lingering questions, it was unequivocal that "*Alliance for Hippocratic Medicine* limited *Havens.*" *Id.* at 564. The Supreme Court "made clear that organizations can sometimes have standing to challenge a government action that does not regulate them if the action causes them to suffer economic harms." *Id.* at 565 (citing *Alliance for Hippocratic Medicine*, 602 U.S. at 383–85). "But the Court also made clear that organizations cannot 'spend [their] way into standing' by voluntarily using resources to counter the government action." *Id.* (quoting *Alliance for Hippocratic Medicine*, 602 U.S. at 394). The plaintiff in *Havens* cleared this high bar because the challenged actions "directly affected and interfered with [its] core business activities." *Alliance for Hippocratic Medicine*, 602 U.S. at 395.

Here, by contrast, S.B. 293 does not "directly affect[] and interfere[]" with Plaintiffs' "core business activities." Both organizations engage in voter registration and education efforts. Compl. ¶¶ 12–31, Dkt. 1 at PageID 3–7. But nothing about S.B. 293 "directly affect[s] and interfere[s]" with those activities. For instance, S.B. 293 does not change the registration process or alter the requirements for registration—the challenged provisions of S.B. 293 all kick in *after* the registration process is completed. Plaintiffs can continue to go about their "core business activities" as usual. Any "causal link" between the challenged law and Plaintiffs' core business activities is broken by their voluntary choice to alter their business activities, a decision that is based purely on speculative fears. *See Tenn. Conference of the NAACP*, 139 F.4th at 564 (citing

3

*Alliance for Hippocratic Medicine*, 602 U.S. at 394–95). Organizational standing requires more—especially after *Alliance for Hippocratic Medicine*.

Moreover, Plaintiffs persist in their assertion of a diversion-of-resources theory despite the Sixth Circuit forestalling that option: "[T]he Supreme Court in *Alliance for Hippocratic Medicine* disavowed our diversion-of-resources theory." *Tenn. Conference of the NAACP*, 139 F.4th at 563. This Court should, consistent with binding precedent, reject Plaintiff's theory of standing based on the voluntary expenditure of resources.

To salvage their theory of organizational standing, Plaintiffs cite a litany of cases from across the country. Pls.' Opp'n at 7, Dkt. 21 at PageID 202 (collecting cases). At the outset, those from before *Alliance for Hippocratic Medicine* can be largely disregarded. Those decisions were made under the old, more permissive regime. The remaining cases are mostly from outside the Sixth Circuit and are nevertheless distinguishable:

- *LULAC v. Exec. Office of the President*, 808 F. Supp. 3d 29 (D.D.C. 2025): There, the organizations had standing because "a documentary-proof-of-citizenship requirement" "would be a direct impediment to one of the organizations' 'core business activities': registering eligible voters." *Id.* at 57. Here, S.B. 293 does not impose any new burdens on voter registration. There is no "direct impediment."

- *N.H. Youth Movement v. Scanlan*, No. 24-cv-291, 2025 U.S. Dist. LEXIS 156192 (D.N.H. Aug. 13, 2025): This was essentially the same situation as *LULAC*. A new documentation requirement would make it more difficult to register voters. *Id.* at *9–13. S.B. 293 has no such direct impact because it imposes no new requirements.

- *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694 (N.D. Ohio 2024): Decided just weeks after *Alliance for Hippocratic Medicine*, this case included a named plaintiff who was injured and an organizational plaintiff that had identified members who regularly assisted voters in submitting their ballots. Plus, the court found the law at issue made it more difficult to vote and thus frustrated the organizational plaintiff's core mission of assisting voters. *Id.* at 703–07 & n.3. Again, S.B. 293 does not add any additional barriers or burdens on voting, and there are no individual plaintiffs or identified injured members.

- *Caicedo v. DeSantis*, No. 6:23-cv-2303, 2024 U.S. Dist. LEXIS 203681 (M.D. Fla. Nov. 8, 2024): This case involved the removal of a candidate from the ballot and primarily relied on a diversion-of-resources theory, which the Sixth Circuit has

4

rejected. *Id.* at *13–16. Regardless, the court found the organization's core business of engaging voters was directly affected by the voter apathy caused by the removal of the candidate. *Id.*

- *Get Loud Ark. v. Thurston*, 748 F. Supp. 3d 630 (W.D. Ark. 2024): There, a new wet-signature requirement directly affected third-party registration organizations by making it more difficult to register voters who could have previously digitally signed. *Id.* at 653–54. S.B. 293 does not make it more difficult to register voters because it imposes no new requirements.

- *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024): As the parties there agreed, the political party plaintiffs had a direct interest in the accuracy of voter rolls. *Id.* at 395–97. Even so, a concurring judge said this was "[b]arely enough" and explained that the Supreme Court had "tightened its standing analysis." *Id.* at 409, 412 (Diaz, J., concurring); *see also id.* at 410 (collecting cases rejecting organizational standing after *Alliance for Hippocratic Medicine*).

A quick search demonstrates there are just as many, if not more, cases post-*Alliance for Hippocratic Medicine* that found no organizational standing under the new narrower regime. *See, e.g.*, *Tenn. Conference of the NAACP*, 139 F.4th at 565–69 (6th Cir. 2025); *Wis. Voter All. v. Millis*, 166 F.4th 627, 636–38 (7th Cir. 2026); *1789 Found., Inc. v. Schmidt*, 781 F. Supp. 3d 282, 312–15 (M.D. Pa. 2025); *Equal. State Pol'y Ctr. v. Gray*, 1:25-cv-117 (D. Wyo. July 22, 2025), Dkt. 10-1; *Republican Nat'l Comm. v. Benson*, 754 F. Supp. 3d 773, 788–91 (W.D. Mich. 2024); *Republican Nat'l Comm. v. Aguilar*, No. 2:24-cv-00518, 2024 U.S. Dist. LEXIS 189613, at *20–27 (D. Nev. Oct. 18, 2024); *Strong Cmtys. Found. of Ariz. Inc. v. Richer*, No. CV-24-02030, 2024 U.S. Dist. LEXIS 185909, at *27–32 (D. Ariz. Oct. 11, 2024).

At the end of the day, Plaintiffs want to pretend as though the doorway to organizational standing remains wide open, but the operative case law demonstrates the door is nearly closed. The narrow gap that remains requires Plaintiffs to plead that S.B. 293 "directly affects and interferes" with "core business activities." They have not done so. Instead, they allege only a voluntary diversion of resources based on speculative harms. Under more recent precedent, and particularly

5

that of the Sixth Circuit, this Court should not reopen the courthouse doors for claims of organizational standing based on these speculative allegations of attenuated self-inflicted injury.

**B.** **Plaintiffs lack associational standing because they have failed to identify a member who has suffered (or is about to suffer) a cognizable injury.**

Plaintiffs misunderstand the thrust of the Secretary's associational standing argument. All can agree that a plaintiff need not always name specific members at the pleading stage. *See, e.g.*, *Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, No. 2:23-cv-1595, 2024 U.S. Dist. LEXIS 154594, at *11–12 (S.D. Ohio Aug. 28, 2024) (noting that "individual members must be 'identified,' not legally named"); *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) ("[W]e have not required that the organizational plaintiffs name names . . . .").

But that does not mean Plaintiff can simply speculate that some amorphous group of its members "are especially vulnerable to being improperly flagged and removed." Pls.' Opp'n at 9, Dkt. 21 at PageID 204 (quoting Compl. ¶¶ 13, 18, 26, 31). The Supreme Court has renounced this approach: "While it is certainly possible—perhaps even likely—that one individual will meet all of these criteria, that speculation does not suffice." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Rather, because standing "is not an ingenious academic exercise in the conceivable," an organizational plaintiff must "identify members who have suffered the requisite harm." *Id.*

Plaintiffs' citations to *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1342 (11th Cir. 2014), and *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 987 (D. Ariz. 2024), do not alter this conclusion. By their own terms, in those cases it was "relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected." *Mi Familia Vota*, 719 F. Supp. 3d at 987; *see also Arcia*, 772 F.3d at 1342 (noting "a realistic danger" and "a high probability that at least one of the members would be mistakenly mismatched"). Here, Plaintiffs have not established a "high

6

probability" or made it "relatively clear" that any of their members will be improperly removed. Instead, Plaintiffs rely on flimsy speculation based on a misreading of S.B. 293.  *See infra* Section C.

Likewise, because Plaintiffs take aim at a strawman version of the Secretary's argument, the string of cases they cite on this topic is largely unhelpful:

- *Ass'n of Am. Physicians & Surgs. v. FDA*, 13 F.4th 531 (6th Cir. 2021):  Unlike here, the plaintiff there identified John Doe doctors it believed were injured.  *Id.* at 543.

- *Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, No. 2:23-cv-1595, 2024 U.S. Dist. LEXIS 154594 (S.D. Ohio Aug. 28, 2024):  The plaintiffs identified members by pseudonym.  *Id.* at *11.  Plaintiffs have not done so here.

- *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189 (5th Cir. 2012): The NAACP alleged that some of its members were "voters from overpopulated and under-represented districts" and thus "were suffering a concrete, particularized injury."  *Id.* at 198.  Plaintiffs have not identified any members who have actually suffered injury.

- *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138 (2d Cir. 2006):  The plaintiff there alleged its members resided and worked at the site in question, so they were actively being harmed.  *Id.* at 143, 146.  Not so here.

- *Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Ga.*, 833 F. App'x 235 (11th Cir. 2020):  The plaintiffs identified a specific class of members who were actually harmed—"all members whose patients are insured by Defendants."  *Id.* at 240.  Plaintiffs have failed to identify such a class of members.

In fact, these cases reaffirm that a plaintiff organization must "identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct."  *Ass'n of Am. Physicians*, 13 F.4th at 543.  But Plaintiffs have failed to do so here.  Instead, they have alleged they have members who *might* be vulnerable to improper removal—but standing "is not an ingenious academic exercise in the conceivable."  *Summers*, 555 U.S. at 499.

Plaintiffs' identification of Jona Hilario does not help them establish standing.  According to Plaintiffs' Complaint, Ms. Hilario is a naturalized citizen who was "improperly flagged in a 2024 election audit" as a noncitizen—long before S.B. 293 took effect.  Dkt. 1 at PageID 3–4.  That is all Plaintiffs tell us about her.  They do not allege, for instance, that Ms. Hilario failed to respond or that

her registration was cancelled.  Nor do they allege that Ms. Hilario has not renewed her driver's license since 2024, which would have triggered an update.  Instead, Plaintiffs simply assert "Ms. Hilario is substantially likely to be flagged again" because "exposure to past harm may 'help show imminent future harm.'"  Pls.' Opp'n at 10, Dkt. 21 at PageID 205 (quoting *Tenn. Conf. of the NAACP*, 139 F.4th at 567).

But yet again, Plaintiffs' argument ignores the way this process works.  When someone is identified as a noncitizen, they are given an opportunity to correct their registration.  *See* Ohio Election Official Manual, Chapter 4: Voter Registration, at 4-145–46, https://www.ohiosos.gov/assets/dir2026-06-ch04.pdf.  The general rule that "exposure to past harm may help show imminent future harm" does not apply to these circumstances.  This is not like the paradigmatic scenario where someone has been cited for violating a statute, so we can expect them to be cited again.  *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (noting "a history of past enforcement" made the threat of future enforcement "substantial").  The opposite is true here: past "flagg[ing]" makes someone substantially less likely to be identified as a noncitizen again because either the error that triggered the removal notice will be corrected, or the voter's registration was correctly identified and subsequently cancelled.  Plaintiffs simply have not alleged facts sufficient to make a plausible claim that Ms. Hilario is at imminent risk of being removed.

Nor does the use of the SAVE system make Ms. Hilario vulnerable.  S.B. 293 does not, as Plaintiff alleges, "mandate[] removing any registered voter whom the BMV database or SAVE system identifies as a noncitizen."  Pls.' Opp'n at 11, Dkt. 21 at PageID 206.  Rather, the statute requires removal of any person who, "according to the databases,"—note the plural—"is not a United States citizen."  It does not mandate removal of anyone who is "flagged" as a noncitizen in either system, a term that the statute does not use and Plaintiffs do not define.

8

By Plaintiffs' logic, all naturalized citizens in Ohio would have standing to challenge S.B. 293. But that argument fails under even minimal scrutiny. Take, for instance, the BMV database. Because all Ohioans applying for a driver's license or state identification card must present documentary proof of their status as a citizen, permanent resident, or temporary resident of the United States, *see* Ohio Admin. Code § 4501:1-1-21(C), naturalized citizens who have an Ohio driver's license or identification card will already be labeled as citizens in the BMV database and thus are at no risk of being identified as noncitizens. Only a newly naturalized citizen who has not yet renewed their Ohio credentials would be at any risk of being incorrectly identified as a noncitizen. Plaintiffs have failed to identify any members within their organizations that thread this narrow needle.

Ultimately, Plaintiffs' allegations that their membership includes naturalized citizens are insufficient to establish associational standing. They have failed to "identify members" with any specificity who have been, or are imminently at risk of being, improperly removed. *Summers*, 555 U.S. at 499. As Plaintiffs noted in their Opposition to the Secretary's Motion to Stay, S.B. 293 is now in effect. Dkt. 22 at PageID 224. If Plaintiffs' fears about their members being improperly "flagged" were legitimate, they would have identified even one member improperly "flagged" and removed. It is telling that they have not done so—perhaps it is because their theory of associational standing, like much of their Complaint, is based on speculative fears. Article III requires more.

**C.** **Conflict preemption analysis requires this Court to harmonize the NVRA and S.B. 293 if possible, not find an unspoken conflict where none exists.**

Plaintiffs' Opposition is premised on a misunderstanding of conflict preemption, as well as an agency's authority to implement state laws. Recall that there are two ways a state statute can be preempted by conflict: (1) if compliance with both state and federal law is "impossible," or (2) if the state law "stands as an obstacle to the accomplishment of the full purposes and objectives

9

of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quotation marks omitted). State laws often give state actors authority to act without providing the precise details by which the act should be performed. These legislative gaps "necessarily require[] the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by the legislature." *Nw. Ohio Bldg. & Constr. Trades Council v. Conrad*, 92 Ohio St.3d 282, 289 (2001) (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)) (cleaned up). Synthesizing these two principles, this Court has a "duty to accept" a reading of the state statutes and implementing regulations that avoids conflict with federal law, so long as it is a "plausible alternative." *Bates v. Dow Agrosciences*, 544 U.S. 431, 449 (2005). And it should start its analysis with a "strong presumption against implied preemption in fields that states traditionally regulate," such as the administration of elections. *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015).

Plaintiffs would have this Court do the opposite. They urge the Court to ignore the regulatory gap-fillers and pretend that the statute *prohibits* the Secretary from taking any action he is not specifically *required* by statute to do. This would allow the Court to read a conflict between state and federal law. For instance, they claim that S.B. 293 does not "appear to contemplate" the Secretary's discretion to conduct individualized inquiries, then they claim that the Secretary "may not exercise discretion that the statute withholds." Pls.' Opp'n at 21, Dkt. 21 at PageID 214. But the statute does not withhold anything from the Secretary. It is silent on how he is to carry out its required processes. The conflict preemption cases instruct the Court to read that silence as *permitting* his discretion, not as "appear[ing]" to "withhold" it.

That is especially true when the Directive and Election Official Manual are considered. *See Mich. Bell Tel. Co. v. MFS Intelenet of Mich., Inc.*, 339 F.3d 428, 433 (6th Cir. 2003) (noting the "inherent logic of . . . allowing state agencies wider deference in state determinations"); *Nw. Ohio Bldg. & Constr.*, 92 Ohio St.3d at 289 (holding that a "legislative gap" is not "equivalent to

10

a lack of authority for the agency to act"). The Secretary does not, as Plaintiffs suggest, "argue[] that his Directive and the EOM somehow cure the statute's legal defects." Pls.' Opp'n at 21, Dkt. 21 at PageID 214. The statute is not defective; it is (in some respects) silent. The Directive and EOM are evidence of how the statute will be interpreted and applied in view of its silence on the precise procedural contours of the Secretary's monthly reviews. Indeed, they are the *only* evidence before the Court of how S.B. 293 will be interpreted and applied—setting aside the statutory chimera Plaintiffs have conjured in their minds.

**D.      Count I: Plaintiffs narrowly read S.B. 293 to violate the NVRA's quiet period where there is no conflict.**

Plaintiffs fail to show that it is impossible for the Secretary to implement S.B. 293's monthly checks without violating the NVRA's quiet period. *Oneok*, 575 U.S. at 377. To manufacture a conflict, Plaintiffs ignore the leeway S.B. 293 gives the Secretary in implementing his review of the voter rolls. Pls.' Opp'n at 11–14, Dkt. 21 at PageID 206–09. Indeed, S.B. 293 does not prohibit the Secretary from conducting individualized inquiries. Ohio Rev. Code § 3503.152(A)–(B). And the Secretary has chosen to do so. *See* EOM at 4-146; Directive 2026-02 at 16. Plaintiffs' reliance on *Arcia*, *Mi Familia Vota*, and other cases are inapt because none of those cases involved a statutory removal scheme *plus* regulations requiring individualized inquiry. *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1339 (11th Cir. 2014) (noting defendant admitted to systematic removal system, no individualized inquiries); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 716 (9th Cir. 2025) (noting Arizona's "periodic cancellation of registrations does not rely on individualized information or investigation"); *Majority Forward v. Ben Hill Cty. Bd. of Elections*, 509 F. Supp. 3d 1348, 1353 (M.D. Ga. 2020) (finding local board of elections used residency database to remove list of voters, no individualized inquiry); *N.C. State Conference of the NAACP v. N.C. State Bd. of Elections*, No. 1:16CV1274, 2016 U.S. Dist. LEXIS 153249, at *4 (M.D.N.C.

11

Nov. 4, 2016) (finding local board of elections removed list of names from voter rolls over residency when single mailings returned without individualized inquiry).  Plaintiffs ask this Court to ignore the Secretary's directives and regulations to create an artificial conflict with the NVRA, but they provide no authority to do so.  Pls.' Opp'n at 11–12, Dkt. 21 at PageID 206–07. Indeed, binding precedent says the Court should do the opposite. *See supra* Section C.

Next, Plaintiffs try to narrow the holding in *Bell*, but they are mistaken.  Pls.' Opp'n at 16, Dkt. 21 at PageID 209.  Controlling circuit precedent interprets the NVRA removal provisions differently from what Plaintiffs argue.  The Sixth Circuit has said that Congress's "list of justifications for removal" does not "bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place."  *Bell*, 367 F.3d at 592. Noncitizens are not eligible to vote.  18 U.S.C. § 611.  If noncitizens are not "ineligible voters" but rather "ineligible applicant[s]" then they are not protected by the NVRA's prohibition against systematic removals during the quiet period. *See* 52 U.S.C. §§ 20507(a)(1), 20507(c)(2)(A).  Indeed, six judges on the Ninth Circuit recognized that *Mi Familia Vota* created a circuit-split with the Sixth Circuit on this very issue.  *Mi Familia Vota v. Fontes*, 152 F.4th 1153, 1156 (9th Cir. 2025) (en banc) (Nelson, J., dissenting) (quoting *Bell v. Marinko*, 367 F.3d 588, 591–92 (6th Cir. 2004)) ("[T]he majority opinion creates a circuit split with the Sixth Circuit, which correctly held that the NVRA does not 'bar the removal of names from the official [state voter rolls] of persons who were ineligible and improperly registered to vote in the first place.'").  And, of course, it is Sixth Circuit precedent that binds this court.

Plaintiffs ignore these facts; they would rather have this court read *Bell* and the NVRA to require the Secretary to retain people on the voter rolls who were never eligible to vote.  Pls.' Opp'n at 16, Dkt. 21 at PageID 209.  These arguments fail to convince.

**E.      Count II: The NVRA does not recognize disparate-impact claims, so Plaintiffs' claim under 52 U.S.C. § 20507(b)(1) fails.**

Plaintiffs devote much of their argument on their uniform-and-nondiscriminatory claim to refuting a position no one has taken.  Pls.' Opp'n at 14–16, Dkt. 21 at PageID 209–11.  The Secretary freely admits that Plaintiffs pleaded that S.B. 293 will discriminatorily *impact* newly naturalized citizens.  Def.'s Mot. Dismiss at 15, Dkt. 10 at PageID 109.  The Secretary strongly disagrees that S.B. 293 would have any such discriminatory impact, but regardless, that is not the standard for claims under 52 U.S.C. § 20507(b)(1).

The Supreme Court previously had an opportunity to recognize disparate-impact claims under the NVRA and declined to do so.  *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 808 (2018) (Sotomayor, J., dissenting) (urging the Court to recognize the alleged disparate impact of Ohio's supplemental process). The majority opinion's analysis on this point bears repeating here:

> The NVRA prohibits state programs that are discriminatory, see § 20507(b)(1), but respondents did not assert a claim under that provision.  And Justice Sotomayor has not pointed to any evidence in the record that Ohio instituted or has carried out its program with discriminatory intent.

*Id*. at 779 (majority opinion).

Plaintiffs denigrate this as a "sentence of dicta" that cannot provide the rule of decision in this case.  Pls.' Opp'n at 16, Dkt. 21 at PageID 211.  Apparently, according to Plaintiffs the Supreme Court did not, in fact, mean what it said merely because it said so in dicta.  Plaintiffs offer no support for this position.  But we must presume the Court means what it says.  And in fact, the Sixth Circuit has noted that Supreme Court dicta "carries considerable persuasive authority," particularly where, as here, it comes from the "determinative opinion in the only Supreme Court case" to address the issue at hand.  *Grutter v. Bollinger*, 288 F.3d 732, 746 n.9 (6th Cir. 2002).  *Husted*, of course, is the only Supreme Court case to construe 52 U.S.C. § 20507.

13

Plaintiffs point instead to a set of lower-court cases purporting to apply a disparate-impact standard to uniform-and-nondiscriminatory claims under the NVRA.  Secretary LaRose explained in his Motion to Dismiss why *United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012), and the cases that rely on it, do not establish disparate-impact claims under Section 8(b) of the NVRA.  Def.'s Mot. Dismiss at 17, Dkt. 10 at PageID 111.

That leaves *Project Vote v. Blackwell*, 455 F. Supp. 2d 694 (N.D. Ohio 2006), another case predating *Husted* and *Tennessee Conference of the NAACP v. Lee*, 730 F. Supp. 3d 705 (M.D. Tenn. 2024), a decision that the Sixth Circuit ultimately reversed,  *see Tenn. Conf. of the NAACP*, 139 F.4th at 569–70 (reversing the district court decision cited by Plaintiffs on standing grounds). *Project Vote* is easily distinguishable because it addressed a law that was discriminatory on its face.  *See* 455 F. Supp. 2d at 703 ("The Court finds that requiring those voter registration workers who are *compensated*, and only those who are compensated, to pre-register with the Secretary of State, undergo an 'online-only' Internet training program, and submit and affirmation for each batch of voter registration forms returned is—on its face—not a uniform and nondiscriminatory attempt to protect the integrity of the electoral process.").  Secretary LaRose does not dispute that laws that explicitly draw distinctions between classes of people may be discriminatory.  But because S.B. 293 does not do so, *Project Vote* is of little value here.

And as to *Tennessee Conference of the NAACP*, setting aside the reversal, the case does not stand for the proposition that uniform-and-nondiscriminatory claims under the NVRA can be based on disparate impact.  The plaintiffs in that case *argued* for a disparate-impact standard: "Finally, TN NAACP argues Tennessee's challenged policy imposes unjustified burdens and barriers to registration on a class of applicants."  730 F. Supp. 3d at 738.  But the court did not embrace that theory.   It found that Tennessee violated the uniform-and-nondiscriminatory provision because it "imposes an unnecessary requirement in a non-uniform manner that does not

14

ensure eligible applicants are registered if their valid registration form is timely received." *Id*. at 740.

This Court should follow *Husted* and reject Plaintiffs' efforts to import a disparate-impact standard into the NVRA.

**F.      Count III: Plaintiffs fail to state a procedural due process claim.**

To begin, there is, at a minimum, "uncertainty in this circuit regarding the viability" of procedural due process claims implicating voting rights outside of the *Anderson-Burdick* framework. *Memphis A. Phillip Randolph Inst. v. Hargett*, 978 F.3d 378, 390 (6th Cir. 2020). And in *League of Women Voters v. Brunner*, 548 F.3d 463 (6th Cir. 2008), the Sixth Circuit held allegations like Plaintiffs' did not state a procedural due process claim.

Plaintiffs' attempts to distinguish *Brunner* are unconvincing.  They limit that case as holding "only that election administration mistakes do not necessarily give rise to a procedural due process claim." Pls.' Opp'n at 17, Dkt. 21 at PageID 212.  But, like here, *Brunner* also involved allegations of "[r]egistered voters" who erroneously "did not appear on voting rolls in their precincts" and were improperly "denied the right to vote." *Brunner*, 548 F.3d at 468.  In that case, Plaintiff alleged these errors (and other issues) "deprive[d] Ohioans of 'their liberty interest in voting and d[id] so without adequate pre- or post-deprivation process.'" *Id.* at 479.

The Sixth Circuit held that even if "Ohio's voting system impinges on the fundamental right to vote," that alone "does not . . . implicate procedural due process" as alleged. *Id.*  So, too, here.  Plaintiffs allege the same thing here that Plaintiff League of Women Voters alleged in *Brunner*. *E.g.*, Compl. ¶ 6, Dkt. 1 at PageID 2 ("SB 293 . . . authorizes the State to deprive eligible voters of their liberty interest in their vote without providing adequate notice and an opportunity to be heard or to cure alleged deficiencies."); *id*. ¶¶75–84, Dkt. 1 at PageID 17–18 (alleging S.B. 293 will result in erroneous voter registration cancellations without notice and a hearing).  The

15

Court should reach the same result and dismiss Plaintiffs' procedural due process claims for want of a protected constitutional interest.

But even if the Court reaches the remaining factors of the *Mathews* test, S.B. 293 passes muster.  As they do throughout, Plaintiffs again rely on their own blinkered reading of S.B. 293 to amplify the risk of erroneous deprivation under its system and the potential value additional safeguards might add.  Pls.' Opp'n at 17, Dkt. 21 at PageID 212.  The Secretary's arguments that the EOM and Directive permit notice and an opportunity to be heard are not "inconsistent with the text of SB 293" because the statute is silent on those issues.  *See supra* Section C.  Plaintiffs further claim that the EOM and Directive demonstrate a "deeply inadequate process."  Pls.' Opp'n at 17, Dkt. 21 at PageID 212.  But their citation for that idea is internal, and it leads to another section simply concluding that—based on their reading of the statute—the EOM offers "a deeply inadequate process."  *Id.* at PageID 215.

Plaintiffs similarly rely on their worst-case reading to downplay the State's interest in ensuring election integrity, promoting public confidence, and administering elections in a timely and orderly manner.  Their argument once again depends on the Secretary interpreting and applying S.B. 293 in a manner that the statute does not compel and that the EOM and Directive indicate will not be the case.  It is not "evidentiary weighing" for the Court to reject Plaintiffs' unsupported reading of the statute in favor of the guidance of the agency that will be administering it.  *See Hughes v. City of Wayne*, No. 22-1178, 2023 U.S. App. LEXIS 10201, at *11 (6th Cir. Apr. 26, 2023); *see also* Def.'s Mot. Dismiss at 3 n. 2, Dkt. 10 at PageID 97.  If the Court is inclined to reach the second and third *Mathews* factors, the Court should reject Plaintiffs' reading and hold that S.B. 293 passes that test.

## CONCLUSION

For the reasons set forth above and in his Motion to Dismiss, Secretary LaRose respectfully requests that this Court dismiss the Complaint for lack of jurisdiction or failure to state a claim.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

/s/ Ann Yackshaw
ANN YACKSHAW (0090623)*
*Counsel of Record
JULIE M. PFEIFFER (0069792)
STEPHEN P. TABATOWSKI (0099175)
GREGORY A. RUSTICO (0104103)
TYLER W. BLAIR (0095595)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Ann.Yackshaw@OhioAGO.gov
Julie.Pfeiffer@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov
Gregory.Rustico@OhioAGO.gov
Tyler.Blair@OhioAGO.gov

Counsel for Defendants

17

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2026, the foregoing was filed with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties for whom counsel has entered an appearance. Parties may access this filing through the Court's system.

*/s/ Ann Yackshaw*

ANN YACKSHAW (0090623)
Assistant Attorney General